**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 14-1379 and 14-1731
_____

MCPC INC.,

Petitioner in No. 14-1379

v.

NATIONAL LABOR RELATIONS BOARD,

Petitioner in No. 14-1731
_____

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board
(No. 6-CA-063690)
_____

Argued:  December 11, 2014

Before:  FUENTES, FISHER, and KRAUSE, *Circuit Judges.*

(Filed: February 12, 2016)
_____

Dean F. Falavolito, Esq. [ARGUED]
Margolis Edelstein
525 William Penn Place
Suite 3300
Pittsburgh, PA 15219

    *Counsel for MCPc, Inc.*

Julie B. Broido, Esq.
Linda Dreeben, Esq.
Gregory P. Lauro, Esq. [ARGUED]
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570

    *Counsel for the National Labor Relations Board*

—————————

OPINION OF THE COURT
—————————

KRAUSE, *Circuit Judge*.

The National Labor Relations Act prohibits employers from discharging union or non-union employees for exercising their organization and collective bargaining rights, including their right to engage in concerted activities for the purpose of mutual aid and protection. MCPc, Inc. appeals the decision and order of the National Labor Relations Board holding that MCPc violated the Act by discharging Jason Galanter for concerted activity, and the Board cross-appeals for enforcement of its order. Our resolution of these issues provides us occasion to clarify both the definition of

"concerted activity" and the test for determining whether that activity formed the basis for an employee's allegedly discriminatory discharge. For the reasons set forth below, we will affirm and enforce in part, vacate in part, and remand to the Board for further consideration in light of this opinion.

## I.   Background

### A.   Factual History

MCPc provides computer consulting, technology, and organizational services from offices in several states. Among MCPc's specialties is the creation of complex telephony systems that allow companies to receive and appropriately route inbound customer calls. MCPc generally employs solution architects to design these technology solutions for client companies, and delivery engineers to implement the solutions. However, because of a company-wide shortage of engineers, Galanter, a senior solutions architect based in MCPc's Pittsburgh office, was tasked with not only designing but also implementing a call center at one of the company's locations in Buffalo.

Domenic Del Balso, MCPc's director of engineering, visited the Pittsburgh office from Cleveland once or twice a month and often took available employees out to lunch on these occasions for "team building" purposes. *MCPc, Inc.*, 360 N.L.R.B. No. 39, 2014 WL 495815, at *1 (Feb. 6, 2014). One such lunch took place on February 24, 2011 and included Galanter; Jeremy Farmer, who was another solutions architect; and Dan Tamburino and Brian Sawyers, both of whom were engineers. At the lunch, the attendees discussed how busy everyone was because of the engineer shortage. During this discussion, Galanter told Del Balso that he was

3

working many hours a week, urged him to hire additional engineers to alleviate the employees' unduly heavy workloads, and—most pertinent to this case—stated that MCPc could have hired several additional engineers with the $400,000 salary MCPc was paying Peter DeMarco, a recently hired executive. Tamburino and Sawyers expressed agreement with Galanter.

After the February 24th lunch, Mike Trebilcock, the company's Chief Executive Officer, was informed of Galanter's comments regarding executive compensation. Because DeMarco had indeed been recently hired by MCPc for what was at the time an unprecedented company salary of $400,000, and because not many people within the company had access to the information in the company's computer systems about executive compensation, Trebilcock became concerned about a possible breach of confidential files. He directed Beth Stec, vice president of human resources and communication, to review Galanter's access to MCPc's computer records, and he was subsequently informed that, in connection with Galanter's implementation of the Buffalo call center project, Galanter indeed had obtained global access privileges and thus had the ability to view on MCPc's computer systems confidential files normally restricted to human resources and information technology personnel.

On March 4, 2011, eight days after the Del Balso lunch, Galanter was asked to travel to the Cleveland office for what turned out to be a face-to-face meeting with Trebilcock and Stec. During the meeting, Trebilcock asked Galanter where he had obtained the salary information that he had mentioned at the February 24th lunch. Galanter provided a number of explanations in quick succession. First Galanter asserted that no one had supplied him the information and

4

attributed his knowledge to what he had found on the Internet[1]—though at the subsequent hearing before the Administrative Law Judge (ALJ), Trebilcock testified that he "never heard that." *Id.*; J.A. 113a. Galanter also told Trebilcock that the salary information was a topic of "water cooler" conversation among many employees. *MCPc, Inc.*, 360 N.L.R.B. No. 39, at \*8. Galanter then switched gears and advised that he might have heard the salary information from Nancy Damin and Greg Jurkowski, two sales representatives from the Buffalo office.

To verify this last explanation, Trebilcock left the room and called Damin and Jurkowski, both of whom were longtime, trusted MCPc employees. Trebilcock was able to reach Damin, who had no knowledge of the salary at issue and denied giving Galanter any such information.[2] In light of Damin's disavowal, Galanter's shifting explanations, and Galanter's access to MCPc's confidential human resources files, Trebilcock concluded that Galanter was lying about how he had obtained the salary information and accused him of disclosing Peter DeMarco's confidential compensation.

---

[1] At the hearing before the Administrative Law Judge (ALJ), Galanter more specifically explained that he conducted an Internet search for the salary that a particular MCPc executive received during the executive's prior tenure at another company. Galanter stated that he used this number to "ballpark[]" what a similarly positioned MCPc executive would make. J.A. 89a.

[2] Trebilcock was able to speak later with Jurkowski, who also denied providing Galanter any information about executive compensation.

5

Galanter admitted to mentioning a compensation amount of $400,000 at the lunch but contended that he had been referring to a different executive, Andy Jones,[3] and that his access to the company's computer system was appropriate to his assigned project. Trebilcock stated that MCPc and Galanter needed to "divorce" and left the room. *MCPc, Inc.*, 360 N.L.R.B. No. 39, at *8. Jeff Kaiser, MCPc's information technology manager, conducted an audit of Galanter's personal computer "to make sure that he wasn't taking with him any MCPc proprietary information or files," and Galanter was escorted from the building.[4] J.A. 116a.

## B.    Procedural History

On December 30, 2011, the Board's General Counsel issued a complaint alleging that MCPc had violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by discharging Galanter for complaining about working conditions, which the General Counsel described as protected concerted activity under § 7 of the Act, *id.* § 157, as well as

---

[3] Galanter also testified at the hearing that he named Jones, not DeMarco, during the lunch, but the ALJ determined that Galanter had named DeMarco based on what the ALJ determined to be the more credible testimony of another lunch attendee, Farmer.

[4] The ALJ determined that the "clear inference from Kaiser's audit" was that no confidential information had been stored on Galanter's personal computer. *MCPc, Inc.*, 360 N.L.R.B. No. 39, at *8 n.24.

6

for maintaining an overbroad confidentiality policy.[5] Following a hearing, the ALJ applied the test approved by *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964), which provides that "§ 8(a)(1) is violated if an employee is discharged for misconduct arising out of a protected activity, despite the employer's good faith, when it is shown that the misconduct never occurred." *MCPc, Inc.*, 360 N.L.R.B. No. 39, at *16 (quoting *Burnup & Sims, Inc.*, 379 U.S. at 23). Because the ALJ determined that Galanter was discharged for accessing MCPc's confidential files after engaging in protected activity at the February 24th lunch and found that Galanter did not in fact access the files, the ALJ concluded that his discharge constituted an unfair labor practice and recommended that MCPc be ordered to cease and desist and to take affirmative remedial action, including offering Galanter full reinstatement and back pay.

MCPc filed exceptions to the ALJ's findings and a supporting brief, in which MCPc emphasized that Galanter was discharged not only for improperly accessing confidential salary information and sharing that information with other employees but also for his dishonesty to Trebilcock. The General Counsel filed an answering brief defending the ALJ's findings and recommendations.

In a decision issued on February 6, 2014, the Board concluded that MCPc's policy barring discussion of confidential information was overbroad in violation of the Act and could not constitute a valid ground for termination. As to whether MCPc had in fact lawfully discharged Galanter

---

[5] MCPc and the Board reached an agreement regarding the language of the confidentiality policy prior to this appeal.

7

for improperly obtaining confidential company information, the Board held that the *Burnup & Sims* test was inapplicable because Galanter had allegedly accessed the files prior to, rather than in the course of, his protected activity, and thus was not terminated for committing misconduct "arising out of" a protected activity. The Board concluded, however, that even assuming the *Burnup & Sims* test applied, and further assuming that MCPc discharged Galanter because it honestly believed he had accessed confidential files, MCPc had violated the statute because, as the ALJ found, Galanter had not committed this misconduct. On this basis, and without reaching MCPc's purported primary rationale for terminating Galanter—his alleged dishonesty about where he had obtained the salary information—the Board affirmed the ALJ's holding that MCPc had discharged Galanter for his protected concerted activity in violation of § 8(a)(1) and ordered, among other things, that MCPc reinstate Galanter and award back pay. MCPc timely filed a petition for review and the Board cross-applied for enforcement of its order.

## II. Jurisdiction and Standard of Review

The Board had jurisdiction to hear and issue a final order in this matter under 29 U.S.C. § 160(a)-(c). We have jurisdiction over MCPc's petition for review and the Board's cross-petition for enforcement pursuant to 29 U.S.C. § 160(e) and (f).

We must accept the Board's factual findings and the reasonable inferences derived from those findings if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f); *see Stardyne, Inc. v. NLRB*, 41 F.3d 141, 151 (3d Cir. 1994). "Substantial evidence is more than a scintilla. It means such relevant evidence as a

8

reasonable mind might accept as adequate to support a conclusion." *Tri-State Truck Serv., Inc. v. NLRB*, 616 F.2d 65, 69 (3d Cir. 1980) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted). The substantiality of the evidence, however, must "take into account whatever in the record fairly detracts from its weight," *id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted), and "where there is a lack of substantial evidence in the record to support the Board's order, we will deny enforcement," *NLRB v. N.Y.-Keansburg-Long Branch Bus Co.*, 578 F.2d 472, 476 (3d Cir. 1978).

The Board's legal determinations are subject to plenary review, but we will uphold the Board's interpretations of the Act if they are reasonable. *Mars Home for Youth v. NLRB*, 666 F.3d 850, 853 (3d Cir. 2011) (citation omitted). We conduct this analysis using the ALJ's findings of fact where, as here, the Board adopts those findings.[6] *Trafford Distrib. Ctr. v. NLRB*, 478 F.3d 172, 179 (3d Cir. 2007) (citation omitted).

## III.    Discussion

Section 7 of the Act affords employees a number of organization and collective bargaining rights, including the right "to engage in [] concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) enforces this guarantee by deeming it "an unfair labor

---

[6] Because the Board made no independent findings, we hereafter refer to the ALJ's factual findings.

9

practice for an employer to interfere with, restrain, or coerce employees in the exercise" of their § 7 rights. *Id.* § 158(a)(1).

MCPc argues that there is no substantial evidence on the record as a whole to support the Board's determination that Galanter engaged in activity protected under the Act. MCPc further contends that even if Galanter engaged in such activity, it was not the basis for Galanter's discharge. Addressing these issues in turn, we will affirm the Board's determination that Galanter engaged in protected concerted activity during the February 24th lunch, but we will remand for further proceedings because the Board failed to apply the correct legal test in determining whether Galanter was discharged for that protected activity or whether he was discharged for his alleged misconduct, irrespective of any protected activity.

## A.

Determining whether Galanter's conduct was protected under the Act requires addressing the threshold question of whether it was "concerted." *See NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 840 (1984). Although the term "clearly enough embraces the activities of employees who have joined together in order to achieve common goals," the Act does not detail, and the courts have not been entirely clear or consistent in articulating, "the precise manner in which particular actions of an individual employee must be linked to the actions of fellow employees in order to permit it to be said that the individual is engaged in concerted activity." *Id.* at 830-31. In order to determine whether Galanter's conduct falls under the protections of the Act, we must therefore first distill from the relevant case law the defining characteristics of "concerted" conduct.

10

**1.**

The Board has the authority to broadly construe "concerted activity" and has interpreted the term to cover not only the union and pre-union efforts of groups of employees seeking to protect their rights but also certain actions undertaken by individuals in the unionized and non-unionized workplace. *See, e.g.*, *D & D Distrib. Co. v. NLRB*, 801 F.2d 636, 640 (3d Cir. 1986); *Hugh H. Wilson Corp.*, 414 F.2d at 1347-48. As the Board stated in *Meyers Industries, Inc.* (*Meyers II*), 281 N.L.R.B. 882 (1986), it recognizes individual conduct as "concerted" both where "individual employees seek to initiate or to induce or to prepare for group action" and where "individual employees bring[] truly group complaints to the attention of management." *Id.* at 887. That these two forms of individual conduct may rise to the level of concerted activity is well accepted among the Courts of Appeals. Thus, in *City Disposal Systems*, the Supreme Court observed that while some Courts of Appeals had incorrectly rejected the proposition that an individual's assertion of a right contained in a collective bargaining agreement may constitute "concerted" conduct, even those courts had recognized that individual conduct qualifies as concerted where an employee intends to induce group activity or serves as a representative of at least one fellow employee. *City Disposal Sys.*, 465 U.S. at 831.

Our Court has had occasion to consider both categories of individual conduct when elucidating the kinds of employee action protected under the Act. For example, in *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683 (3d Cir. 1964), we recognized that activity may be concerted "although it involves only a speaker and a listener" if the individual engages in it "with the object of initiating or inducing or

11

preparing for group action or [] it ha[s] some relation to group action in the interest of the employees." We held that the employee in that case, however, engaged in "mere griping" and not concerted activity when he privately dispensed advice to employees "without involving fellow workers or union representation to protect or improve his own status or working position." *Id.* at 683, 685 (internal quotation marks omitted). And although we have recognized that an individual employee may engage in concerted activity when he complains to management, we have done so specifically where the action was taken with the apparent imprimatur of coworkers. *See Frank Briscoe, Inc. v. NLRB*, 637 F.2d 946, 949 (3d Cir. 1981) (concluding activity was concerted where five complainants individually filed similar charges of racial discrimination within days of being collectively laid off and in their complaints referred to the same mistreatment of other employees).

Galanter's conduct does not fit neatly into the paradigm of either *Mushroom Transportation* or *Frank Briscoe*. Instead, Galanter appears to have complained to management to improve his working position without the imprimatur of other employees but arguably also to induce group action in the interest of those employees. MCPc posits that without evidence of prior coordination with his coworkers, Galanter's statements about the engineer shortage should be deemed "mere griping," unprotected under *Mushroom Transportation*. MCPc's Br. at 15-17 (quoting *Mushroom Transp. Co.*, 330 F.2d at 684-85) (internal quotation marks omitted). MCPc, in other words, would have us treat the varieties of "concerted activity" at issue in *Mushroom Transportation* and *Frank Briscoe* as the exclusive categories of activity protected in this Circuit. This we

12

decline to do, as the touchstone for an individual's concerted activity under *Meyers* and our Court's precedent remains whether the employee intends to induce group activity or whether the employee's action bears some relation to group action in the interest of the employees. Our applications of this test to the particular fact patterns presented in *Mushroom Transportation* and *Frank Briscoe* were not intended either to alter the test itself or to foreclose a determination that an individual engages in concerted activity when he expresses grievances to management about a matter of general employee interest in a group meeting context such as this one.

Indeed, a long line of decisions by the Board and other Circuits indicates that such conduct may satisfy the test for concerted activity. For instance, in *Whittaker Corp.*, 289 N.L.R.B. 933 (1988), the Board ruled that a lone employee had engaged in concerted activity when, without conferring in advance with his fellow employees, he contested the suspension of the customary annual wage increase during a group meeting called by management to discuss the policy change. *Id.* at 934; *see also NLRB v. Caval Tool Div.*, 262 F.3d 184, 190 (2d Cir. 2001) (affirming the Board's holding that an employee engaged in concerted activity when he made statements about the company's new break policy at an employee meeting called by the employer to address the policy); *NLRB v. Talsol Corp.*, 155 F.3d 785, 797 (6th Cir. 1998) (holding that an employee's comments about safety at a group meeting attended by employees and management constituted concerted activity because the meeting was conducted to address plant safety concerns, the employee's questions were on the topic of safety, and the context indicated that the employee's statements were "[c]learly . . . not purely personal gripes"); *Rockwell Int'l Corp. v. NLRB*,

13

814 F.2d 1530, 1535 (11th Cir. 1987) (upholding the Board's conclusion that an employee engaged in concerted activity when she objected to the employer's noise lecture during an employee meeting arranged to discuss the issue).

Notably for purposes of the case before us, the Board and other Courts of Appeals have extended this line of reasoning to the lone employee who complains to management in a less organized group context and who, in so doing, successfully attracts the impromptu support of at least one fellow employee. In *Worldmark by Wyndham*, 356 N.L.R.B. No. 104, 2011 WL 757874 (Mar. 2, 2011), for example, the Board held that an employee engaged in concerted activity when he protested a change in the company's dress code on the sales floor in front of other sales representatives, finding that "any doubt about the concerted nature of [the employee's] action is removed by [a second employee] joining that action." *Id.* at \*3; *see also Kiewit Power Constructors Co. v. NLRB*, 652 F.3d 22, 24-26 (D.C. Cir. 2011) (affirming the Board's holding of protected concerted activity where, first, one union member and then another objected to management's attempt to issue individualized warnings about a new break policy in front of other employees while the protesting employees were on the job). Although merely complaining in a group setting would surely not be sufficient in itself to transform an individual grievance into concerted activity, we rely on *Worldmark by Wyndham* for the narrow proposition that in such circumstances a lack of prior planning does not foreclose a finding of concerted activity, where the individual's statements further a common interest or by their terms seek to induce group action in the common interest.

14

Against the backdrop of these cases, we conclude Galanter engaged in concerted activity when he communicated his dissatisfaction about shared working conditions to a member of MCPc's management during the February 24th lunch. Although the lunch was not organized for the express purpose of discussing any particular company policy, it nonetheless was a "team building" lunch that provided a group forum within which Galantar could relay to management complaints shared by other employees about workplace conditions they wished to see improved. *See MCPc, Inc.*, 360 N.L.R.B. No. 39, at \*1; J.A. 108a. And much as the Board reasoned in *Worldmark by Wyndham*, 356 N.L.R.B. No. 104, at \*3, any doubt as to whether Galanter's statements qualify as concerted activity is dispelled by the fact that two other employees expressed their agreement when Galanter urged MCPc to hire more engineers and contended that the company had the financial ability to do so.

MCPc marshals a number of arguments to support its position that Galanter's statements did not constitute concerted activity, but we find them unpersuasive. First, contrary to MCPc's assertions, prior group action is not required to support the conclusion that Galanter engaged in concerted activity. Consistently, "[t]he Board has found concerted activity when a second employee joins an individual employee's protest without requiring evidence of a previous plan to act in concert." *Id.* at \*4 (citations omitted). On a related note, the appointment of a spokesperson may be helpful insofar as it tends to support an inference of group action or preparation for group action, but MCPc is incorrect in characterizing it as a requirement. Rather, the Board has found concerted activity "where an individual, not a

15

designated spokesman, [has] brought a group complaint to the attention of management." *Meyers II*, 281 N.L.R.B. at 886.

Second, although MCPc draws on certain language in *Mushroom Transportation* to argue that Galanter was required to contemplate group action after the team building lunch, the issue in that case was whether private advice dispensed by one employee to another exhibited any of the purpose required for concerted activity. *See Mushroom Transp. Co.*, 330 F.2d at 685. Here, in contrast, Galanter's purpose is apparent from not only the content but also the circumstances of his complaint, which was directed at management in a manner and setting indicating an intent to garner employee support. That Galanter lacked plans to pursue the issue after the lunch does not alter the concerted character of his activity at the lunch.

Third, that an employee expresses grievances that are well known or widely held does not undermine the concerted nature of his activity. MCPc argues that, when considered in conjunction with his failure to organize other employees before or after the lunch, the fact that the engineer shortage was a problem already acknowledged and in the process of being addressed by management is fatal to Galanter's contention that his complaints constituted concerted activity. We disagree. That the engineer shortage was a subject of general concern within the company, if anything, supports rather than undercuts the ALJ's conclusion that Galanter voiced his grievances for the benefit of others as well as himself. *See Hugh H. Wilson Corp.*, 414 F.2d at 1350 ("Even though the employees had not communicated that a 'group' had existed, and management may have inferred that it was dealing with individual gripes, the consensus of the affected, unhappy employees was sufficient to support a finding that

16

the activity was in concert and, therefore, protected." (describing *NLRB v. Guernsey-Muskingum Elec. Co-op., Inc.*, 285 F.2d 8 (6th Cir. 1960)).

In short, MCPc's arguments fail because they espouse an unduly cramped interpretation of concerted activity under § 7—one that assesses concerted activity in terms of isolated points of conduct rather than the totality of the circumstances. *See id.* at 1354 (rejecting the employer's evaluation of the character of each employee statement and act in isolation and instead finding that "[i]t is the totality of [the employees'] conduct" that supports a finding of concerted activity); *cf. City Disposal Sys.*, 465 U.S. at 831 (observing that the language of § 7 is not narrowly confined to two or more employees working toward a common goal and holding that the Board reasonably concluded that a lone employee's invocation of a right grounded in his collective-bargaining agreement is a concerted activity).

When synthesized, the relevant precedent from our Court and the Board reflects that the benchmark for determining whether an employee's conduct falls within the broad scope of concerted activity is the intent to induce or effect group action in furtherance of group interests. Where the ALJ and the Board found that Galanter's complaints about excessive workloads at the February 24th team building lunch related to improving working conditions for not only himself but also his coworkers and evinced an intent to galvanize his fellow employees into action, the complaints cannot be dismissed as "mere griping" about a condition of employment, except in the absence of substantial supporting evidence. *Mushroom Transp. Co.*, 330 F.2d at 685 (internal quotation marks omitted). We therefore agree with the Board

17

that those complaints constituted concerted activity under § 7.[7]

**2.**

Having concluded that Galanter's statements were concerted, we have little difficulty determining that these statements were also protected. Concerted activity is protected under § 7 as long as it is undertaken "for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C. § 157 (1976), and actions taken for mutual aid or protection include those intended to improve conditions of employment, *see Asplundh Tree Expert Co. v. NLRB*, 365 F.3d 168, 172 n.3 (3d Cir. 2004). Galanter's complaints to Del Balso about the effect of the engineer shortage on the employees' quality of life clearly related to improving employee work conditions and were not "unlawful, violent, or in breach of contract" and thus did not "fall outside the shelter of [§] 7." *Wheeling-Pittsburgh Steel Corp. v. NLRB*, 618 F.2d 1009, 1018 (3d Cir. 1980) (quoting *NLRB v. Wash. Aluminum Co.*, 370 U.S. 9, 17 (1962)). Indeed, the ALJ explicitly found that Galanter's statements lacked "any malicious dimension" and that this was "crucial" in establishing that his particular communications fell under the auspices of the Act. *MCPc, Inc.*, 360 N.L.R.B. No. 39, at *14. Galanter's concerted activity was therefore protected under the Act.

---

[7] We need not address whether Galanter's mention of DeMarco's salary information constituted protected activity as his complaints about the engineer shortage were protected even without this reference to a particular executive compensation figure.

18

**B.**

We turn next to whether substantial evidence supports the Board's conclusion that Galanter's protected statements at the February 24th lunch formed the basis for his discharge.[8] MCPc challenges this conclusion on the ground that it terminated Galanter for (1) improperly obtaining confidential salary information; (2) disseminating that information; and (3) lying to the CEO about where he had obtained the information.[9]  MCPc's Br. at 33, 49; *see also* J.A. 79a; Oral Arg. at 13:53, *available at* http://www2.ca3.uscourts.gov/oralargument/audio/14-1379MCPCIncv.NLRB.mp3.

As an initial matter, we conclude that the Board reasonably dismissed the second of these rationales because

---

[8] Because MCPc does not contend that it lacked "knowledge, or reason to know, that the employee activities have coalesced into group action for mutual aid or protection" as required to violate § 8(a)(1), the knowledge requirement is not a point of dispute in this case. *Tri-State Truck Serv., Inc.*, 616 F.2d at 71.  In any event, as Galanter complained to management and multiple employees agreed with his complaints in the presence of management, implicit in our conclusion that Galanter engaged in concerted activity is that MCPc had the requisite knowledge of the concerted nature of the activity.

[9] Though MCPc emphasizes Galanter's alleged dishonesty, we address the first two of these rationales for Galanter's discharge because MCPc characterizes them as at least contributing factors in his termination.

19

MCPc's policy of barring employees from disseminating confidential information was overbroad in violation of the Act. To defend a discharge based on a rule that even "has the tendency to inhibit [protected] activity," an employer must show "legitimate and substantial business justifications" for the rule. *Jeanette Corp. v. N.L.R.B.*, 532 F.2d 916, 918 (3d Cir. 1976) (quoting *N.L.R.B. v. Fleetwood Trailer Co.*, 389 U.S. 375, 378 (1967)). Not surprisingly, MCPc failed to make such a showing here as to its confidentiality policy, as rational employees could interpret that policy not merely to inhibit but to prohibit certain protected activities, including wage discussions, rendering it "prima facie violative of [§] 8(a)(1)" and incapable of sustaining a discharge. *Id.*

The other explanations offered by MCPc—that Galanter was discharged for improperly obtaining confidential salary information and for lying about where he obtained the information—could constitute legitimate business justifications for MCPc's decision, but the ALJ and Board applied the wrong legal test in analyzing the first rationale and did not apply any test to the second. Because the ALJ and Board's rejection of these rationales may have stemmed from confusion as to the appropriate analytical framework, we address the choice of test before turning to its application in this case.

## 1.

Where an employer argues that it discharged the employee for reasons unrelated to his protected activity, such as tardiness or poor work performance, we rely on the so-called "mixed motive" or "dual motive" discharge test set forth by the Board in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir. 1981), and

approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 397-404 (1983), *abrogated by Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994). "Under this test, if the General Counsel makes a prima facie showing that protected conduct was a motivating factor in the employer's decision, the burden shifts to the employer to demonstrate that the 'same action would have taken place even in the absence of the protected conduct.'" *NLRB v. Alan Motor Lines Inc.*, 937 F.2d 887, 889 (3d Cir. 1991) (quoting *Wright Line*, 251 N.L.R.B. at 20-21); *accord D & D Distrib. Co. v. NLRB*, 801 F.2d 636, 642 (3d Cir. 1986) (citing *Transp. Mgmt. Corp.*, 462 U.S. at 401-02). *Wright Line* is designed to preserve what has long been recognized as the employer's general freedom to discharge an employee "for a good reason, a poor reason, or no reason at all, so long as the terms of the [Act] are not violated." *See Meyers Indus.* (*Meyers I*), 268 N.L.R.B. 493, 497 n.23 (1984) (quoting *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 75 (3d Cir. 1942)).

We take a different approach in those "special circumstances" where the employee is discharged for allegedly engaging in misconduct during his protected activities, *id.*, providing employees heightened protection against meritless suspicions of misconduct allegedly committed in the course of these activities to prevent the activities from "acquir[ing] a precarious status," *Burnup & Sims, Inc.*, 379 U.S. 23. In such cases, an employer's good faith that an employee committed misconduct is not the last word on the lawfulness of its adverse employment action: "[§] 8(a)(1) is violated if it is shown that the discharged employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the discharge

21

was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct." *Tri-State Truck Serv., Inc.*, 616 F.2d at 69 (quoting *Burnup & Sims*, 379 U.S. at 23). Under this test, after the employer carries its burden of showing that it held an honest belief that the employee engaged in misconduct, the burden then shifts to the General Counsel to "affirmatively show that the misconduct did not in fact occur." *Pepsi-Cola Co.*, 330 N.L.R.B. 474 (2000).

The ALJ applied the *Burnup & Sims* framework to MCPc's allegation that Galanter improperly accessed confidential company information, reasoning that Galanter's alleged misconduct was not wholly unconnected to Galanter's February 24th statements so as to warrant the application of *Wright Line*. The Board, in contrast, determined that *Burnup & Sims* did not apply because Galanter allegedly accessed the confidential records not in the course of the February 24th lunch but prior to it. As for MCPc's primary rationale for discharging Galanter—his alleged dishonesty to Trebilcock—neither the ALJ nor the Board acknowledged the need to apply any test.[10]

---

[10] The ALJ observed in a brief footnote that "[t]he Company's only contention that could qualify for *Wright Line* analysis," its allegation that Galanter had been discharged for unrelated job performance, was pretextual and hence would fail the *Wright Line* test. *MCPc, Inc.*, 360 N.L.R.B. No. 39, at \*16. n.29. For the reasons set forth below, we conclude that *Wright Line* is more broadly applicable than the ALJ recognized, including to the contention that Galanter was discharged for dishonesty. As to the question of job performance, MCPc contends that it never argued that

22

We agree with the Board's determination that, because the misconduct did not take place during Galanter's protected discussion with management, *Burnup & Sims* is not the correct test for analyzing his alleged improper access to confidential company salary information. And although the Board did not address MCPc's charge that Galanter lied to Trebilcock, we conclude that, for the same reason, *Burnup & Sims* is not the appropriate framework for assessing Galanter's alleged dishonesty, which purportedly took place after the protected activity. We recognize that in *Burnup & Sims* the Supreme Court's descriptions of the misconduct to which the test applies alternated between misconduct "arising out of" protected activity and misconduct occurring "in the course of" protected activity, but close examination of the Court's reasoning reveals that both phrases refer narrowly to misconduct that occurs during protected activity.

Specifically, in *Burnup & Sims*, to support the observation that the Board has repeatedly ruled that an employee should not be discharged for supposed misconduct "arising out of a protected activity" if the misconduct did not occur, the Supreme Court cited only Board cases involving misconduct that allegedly took place while protected strike activities were ongoing. *See Burnup & Sims*, 379 U.S. at 23 (citing *Mid-Continent Petroleum Corp.*, 54 N.L.R.B. 912, 933-34 (1944) (where union members allegedly committed unlawful seizure of company property and engaged in acts of

---

Galanter was discharged for the quality of his work and that it introduced evidence of problems with Galanter's work performance at the hearing simply "in order to refute counsel's depiction of [Galanter] as a model employee." J.A. 32a.

23

violence during a strike); *Standard Oil Co. of Cal.*, 91 N.L.R.B. 783, 790-91 (1950) (where strikers were allegedly discharged for acts such as throwing rocks during a strike); *Rubin Bros. Footwear, Inc.*, 99 N.L.R.B. 610, 610-12 (1952) (where striker was allegedly violent toward another employee attempting to return to work during the strike)). And in the years since, the Board has consistently emphasized that *Burnup & Sims* applies exclusively when the misconduct occurs during protected activities, while *Wright Line* generally does not apply. *See, e.g.*, *Yuker Constr. Co.*, 335 N.L.R.B. 1072, 1073 (2001) (finding that *Burnup & Sims* did not apply where the alleged misconduct occurred during a particular portion of the conversation that the Board deemed unprotected); *KSM Indus., Inc.*, 336 N.L.R.B. 133, 136 n.3 (2001) (observing that *Wright Line* does not apply where a striker is discharged "for alleged misconduct during a protected activity").

The Board's conclusion that *Burnup & Sims* does not apply in this case also comports with its recent decision in *Fresenius USA Manufacturing, Inc.*, 362 N.L.R.B. No. 130, 2015 WL 3932160 (June 24, 2015). There, the Board applied *Wright Line* to determine that, even assuming that the vulgar, arguably threatening statements that a union supporter had written on union newsletters in the employee break room constituted protected activity, the employer had lawfully discharged the employee for his dishonesty during the legitimate company investigation that followed. *Id.* at *3. In addition, we find instructive the D.C. Circuit's approach in *Frazier Industrial Co. v. NLRB*, 213 F.3d 750 (D.C. Cir. 2000). That court applied an analysis consistent with *Burnup & Sims* to the employer's first stated rationale for discharging a union organizer—that the employee had allegedly harassed

workers while attempting to persuade them to sign union cards; however, with respect to the employer's second rationale—that the employee was insubordinate and dishonest to management about his protected activities—the D.C. Circuit applied a *Wright Line* analysis because the alleged dishonesty did not occur during the protected union solicitation. *Id.* at 756-59; *see also Shamrock Foods v. NLRB*, 346 F.3d 1130, 1136 (D.C. Cir. 2003) (explaining that its *Frazier* analysis was consistent with the application of *Burnup & Sims* for misconduct during protected activity and *Wright Line* for misconduct that postdated the protected activity).

Based on the foregoing, we hold that *Wright Line* is the appropriate test for assessing whether, as MCPc contends, it terminated Galanter for allegedly obtaining confidential files in advance of the February 24th lunch and for his alleged dishonesty to Trebilcock eight days after the lunch.[11]

---

[11] This is not a case in which the employer's motive for questioning the employee was allegedly entirely unlawful, such that the interrogation was itself a violation of the Act and the employee's alleged dishonesty therefore immaterial for purposes of determining the lawfulness of the discharge. *Cf. 800 River Rd. Operating Co. LLC v. NLRB*, 784 F.3d 902, 915 n.6 (3d Cir. 2015) (emphasizing that a legitimate internal investigation does not necessarily constitute a violation of the Act and that an employer's justification for employee interviews may overcome the coercive effect of an interview on employees' union activities). In such circumstances, *Wright Line* is inapplicable, for an employee is under no obligation to respond to unlawful questions about protected activities, and even dishonesty in response to such questions

**2.**

Although it may be that in rejecting *Burnup & Sims*, the Board meant to invoke *Wright Line* as the appropriate test for analyzing the lawfulness of Galanter's discharge, the Board neither noted the applicability of *Wright Line* nor applied it in this case. Instead, after acknowledging that the ALJ had incorrectly applied *Burnup & Sims* to determine that Galanter's discharge was unlawful, the Board rested its decision on the rationale that "even assuming the applicability of *Burnup & Sims*," MCPc would not prevail.[12] *MCPc, Inc.*, 360 N.L.R.B. No. 39, at \*2. Thus, whether or not we agreed that substantial evidence in the record supported the Board's ultimate disposition, our disagreement with Board's rationale

---

has been held an unlawful ground for discharging the employee. *See Spartan Plastics*, 269 N.L.R.B. 546, 552 (1984).

[12] The Board may have declined to apply *Wright Line* on the grounds that MCPc "failed to except" to the ALJ's rejection of its *Wright Line* argument. *See MCPc, Inc.*, 360 N.L.R.B. No. 39, at \*2 n.8. But MCPc preserved its argument that its stated rationales for Galanter's discharge, including Galanter's dishonesty, were not pretextual, and, in assessing any claim properly before it, the Board must apply the correct legal standard to the relevant facts, *Auciello Iron Works, Inc.*, 317 N.L.R.B. 364, 366 (1995). In the same vein, as the reviewing court, we "retain[] the independent power to identify and apply the proper construction of governing law." *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 413 n.3 (3d Cir. 2012) (alteration in original) (quoting *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 99 (1991)).

26

would prevent us from affirming. *See Konan v. Att'y Gen.*, 432 F.3d 497, 501 (3d Cir. 2005) ("It is a bedrock principle of administrative law that judicial review of an agency's decision is limited to the rationale that the agency provides.").

Given the nature of the Board's error, generally the "proper course" would be to remand to the Board for application of the correct legal test. *Yusupov v. Att'y Gen.*, 650 F.3d 968, 993 (3d Cir. 2011) (quoting *Kang v. Att'y Gen.*, 611 F.3d 157, 168 (3d Cir. 2010)). We deviate from this practice, however, in "rare circumstances where application of the correct legal principles to the record could lead only to the same conclusion," such that "there is no need to require agency reconsideration." *Id.* (internal quotation marks omitted). We must consider whether this case presents that rare circumstance, given the limited nature of the showing MCPc must make to prevail under *Wright Line* and the significant evidence in the record supporting MCPc's contention that it fired Galanter for improperly accessing confidential information or, alternatively, for his dishonesty to Trebilcock.

Under *Wright Line*, to credit MCPc's contention that it did not discharge Galanter for his statements at the February 24th lunch, the ALJ did not need to determine whether Galanter actually improperly accessed confidential salary information, or whether he was dishonest or simply misspoke "under the heat of the CEO's repeated questioning," N.L.R.B.'s Br. at 31. Once the General Counsel showed an improper motivation for Galanter's discharge, all that remained was for the ALJ to determine whether Galanter would have been fired on account of his alleged misconduct regardless of any forbidden motivation. *See Transp. Mgmt. Corp.*, 462 U.S. at 401.

27

As for the evidence in the record supporting such a determination, we take particular note of (1) the ALJ's own findings as to Galanter's demeanor and statements while being questioned by Trebilcock, which are consistent with the testimony offered by both Galanter and Trebilcock, (2) the ALJ's finding that Galanter misled Trebilcock and, by extension, the court, about the identity of the executive he named during the February 24th lunch, and (3) physical evidence tending to undermine Galanter's assertion that he obtained the salary information from the Internet.

First, and most significantly, the ALJ found that Galanter was "purposely vague and evasive" when Trebilcock questioned him about the source of the salary information and that he gave "inconsisten[t]" statements to Trebilcock during their meeting in Cleveland. *MCPc, Inc.*, 360 N.L.R.B. No. 39, at *8 n.23. These findings align with Trebilcock's testimony about the factors that led him to conclude Galanter was untrustworthy and should be discharged: Galanter refused to provide a straight answer about where he had obtained the salary information; Galanter had global access to MCPc's computer systems, including human resources data; and, upon questioning, Galanter falsely implicated two employees whom Trebilcock "trust[ed] . . . greatly" and who had worked for MCPc for 15 years. J.A. 113a. Thus, Trebilcock explained, because "everything . . . add[ed] up to a lack of trust" and the heart of MCPc's business was maintaining the "integrity" of its customers' data, Trebilcock decided that he "could not move forward" with Galanter. J.A. 113a.

Moreover, Galanter's equivocations are apparent from his own testimony. Galanter acknowledged that he provided Trebilcock shifting explanations for the source of the salary

28

information, including that no one had given him the information, that it was available on the Internet, and that it came from general "water cooler" talk among employees. J.A. 90a. Upon further questioning by Trebilcock, Galanter offered that the information may have come from Damin and Jurkowski, and then, on cross examination, admitted that neither employee had actually provided him the salary information and expressed uncertainty as to whether he had ever even discussed the topic of the executive's salary with them.

Second, the ALJ also determined that Galanter misled Trebilcock about the identity of the executive Galanter had named at the lunch. Concluding that, at the February 24th lunch, Galanter had mentioned not Andy Jones but Peter DeMarco, the executive recently hired at a salary of $400,000, the ALJ decided that "it [was] more likely that [Galanter] only invoked Jones' [sic] name when confronted by Trebilcock." *MCPc, Inc.*, 360 N.L.R.B. No. 39, at *8 nn.16, 22. In short, the ALJ found that Galanter provided Trebilcock an untrue statement, a conclusion that should have been deemed relevant in assessing MCPc's assertion that Galanter was fired for lying to Trebilcock. The ALJ's finding also bears on Galanter's accuracy, if not honesty, under oath, since Galanter also testified during the hearing that he never mentioned DeMarco's name.

Third, Galanter offered into evidence as Exhibit 6 a printout of the website that he visited containing data that he allegedly used to estimate the named MCPc executive's salary. As MCPc highlighted in its cross-examination of Galanter, however, that printout bears a copyright date of 2012—thus on its face appearing to discredit Galanter's contention that he relied on this page over one year earlier at

29

the February 24, 2011 lunch. Although whether Galanter actually gained improper access to the confidential company files is not dispositive under *Wright Line*, which focuses on the employer's motivation for its adverse employment action, the possibility that Galanter was fabricating evidence post-hoc or giving false testimony seems highly relevant to the ALJ's credibility findings.

All of this evidence together supports MCPc's contention that it would have discharged Galanter regardless of his statements at the February 24th lunch for improperly obtaining salary information and then being dishonest about his behavior. The ALJ nonetheless rejected MCPc's explanations as pretextual, apparently crediting Galanter's testimony over Trebilcock's, and the Board adopted this finding. Although we give conclusive effect to such findings where supported by substantial evidence, *Trafford Distrib. Ctr. v. NLRB*, 478 F.3d at 179, whether evidence is substantial turns in part on whether due consideration has been given to those portions of the record supporting the contrary result. *Tri-State Truck Serv., Inc.*, 616 F.2d at 69. Here, certain aspects of the ALJ's findings raise concerns under this standard, including internal inconsistencies in those findings, potentially significant misstatements of the record, and the ALJ's failure to address Exhibit 6.

Most glaringly, the ALJ's rejection of MCPc's stated reasons for terminating Galanter as "merely a pretext designed to manufacture [his] termination for unlawful motives," *MCPc, Inc.*, 360 N.L.R.B. No. 39, at *16 (alteration in original) (internal quotation marks omitted), conflicts with its own extensive findings as to Galanter's "inconsisten[t]," "purposely vague and evasive" responses to Trebilcock. *Id.* at *8 n.23.

In addition, the ALJ appears to have misapprehended critical portions of the record. For instance, citing to pages 26-29 of the hearing transcript, the ALJ found that the audit of MCPc's systems "corroborated Galanter's contention that he did not engage in any unauthorized access of Company files" and "undermine[d] the testimony of Company witnesses who assumed that he did because of his access." *Id.* at *7 n.13. The testimony cited for this proposition, however, is Galanter's self-serving denial that he improperly accessed the confidential information. Meanwhile, the testimony of MCPc's information technology manager, Jeff Kaiser, actually was that the audit did show that Galanter had access rights to confidential files to which he should not have had access. Specifically, although MCPc could not determine from the available data how Galanter had obtained the access rights and whether Galanter had in fact exercised those rights, Kaiser explained that Galanter had the technical capability to grant access rights to himself using the administrative rights that he was provided for purposes of implementing the call center project.

In another instance, the ALJ appears to have placed great weight on his belief that "[n]otwithstanding Galanter's inconsistencies as to his statements at the meeting, Trebilcock conceded that he made the 'gut feeling' remark"—referring to Galanter's testimony that, just before firing him, Trebilcock admitted to having a "gut feeling" that Galanter "didn't do anything wrong here." *Id.* at *8 & n.23. Trebilcock's testimony, however, reflects no such concession. On the contrary, Trebilcock testified that "my gut was telling me that . . . everything was adding up to a lack of trust," based on "the fact that he had access to the [salary] information, and he had already comprised [sic] two employees that have been

31

part of the organization for 15 years, you know, in effect lied about that in my mind because I trust both of them greatly." J.A. 113a. Due consideration of the actual testimony provided by these witnesses might have led the ALJ or the Board to a different conclusion.

Lastly, neither the ALJ nor the Board addressed Exhibit 6, the printout of the webpage that Galanter described as the source of his information about the $400,000 salary several weeks prior to the February 24, 2011 lunch but which bore a 2012 copyright date. Although it is possible that the date discrepancy on Exhibit 6 resulted from an automatic update on the website in question, the ALJ made no such finding and, indeed, no mention whatsoever of this evidence in his decision.

In sum, the ALJ and Board's determination that Galanter was terminated for his protected statements at the February 24th lunch does not appear to take into account significant countervailing evidence in the record indicating that MCPc would have discharged Galanter regardless of his statements because it believed that he engaged in improper data access, dishonesty, or both. *See Tri-State Truck Serv.*, 616 F.2d at 69 (citing *Universal Camera Corp.*, 340 U.S. at 488).

That said, we are not persuaded that this is the exceptional case where "there is no need to require agency reconsideration."[13] *Yusupov*, 650 F.3d at 993. To prevail on

---

[13] We do not suggest what conclusion the Board should reach, in applying the correct test, as to whether Galanter was discharged for engaging in protected activity. Rather, we offer the observations above to illustrate why

32

a *Wright Line* defense, an employer must show that it has applied its disciplinary rules regarding the conduct at issue "consistently and evenly." *Septix Waste, Inc.*, 346 N.L.R.B. 494, 496 (2006). Thus the Board's past decisions and our own precedent suggest it also would be appropriate to remand for the Board to take into account evidence of MCPc's expectations regarding employee integrity and honesty as set forth in its policies, as well as its past practices in imposing disciplinary measures for misconduct or dishonesty of the kind alleged here. *See Hanlon & Wilson Co. v. N.L.R.B*, 738 F.2d 606, 616-18 (3rd Cir. 1984); *D & D Distrib. Co.*, 801 F.2d at 642-43.

## IV. Conclusion

For the foregoing reasons, while we agree with the Board's conclusion that Galanter engaged in protected concerted activity during the February 24th lunch, we will vacate and remand for the Board to consider under *Wright Line* whether that activity or MCPc's belief that Galanter

---

further agency consideration is appropriate. Among other things, in reweighing the evidence under the proper legal framework on remand, the Board may consider MCPc's original position statement, which asserted that MCPc terminated Galanter for disclosing confidential salary information, and which the Board's General Counsel cites as a clear admission as to the real reason for Galanter's discharge, N.L.R.B.'s Br. at 13. Although MCPc has argued on appeal that it was improper for the ALJ to consider the position statement, the Board's case law is to the contrary. *See United Scrap Metal, Inc.*, 344 N.L.R.B. 467, 468-69 & n.5 (2005).

engaged in misconduct or dishonesty formed the basis for his discharge.