**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 23-2689 & 23-2857
_____

MILLER PLASTIC PRODUCTS INC,

Petitioner in no. 23-2689

v.

NATIONAL LABOR RELATIONS BOARD
_____

NATIONAL LABOR RELATIONS BOARD,

Petitioner in no. 23-2857

v.

MILLER PLASTIC PRODUCTS INC
_____

On Petition for Review and
Cross-Application for Enforcement of a
Decision and Order of the
National Labor Relations Board
(NLRB Docket No. 06-CA-266234)
_____

Argued September 19, 2024

Before: RESTREPO, McKEE, and SMITH, *Circuit Judges.*

(Opinion filed: June 23, 2025)

_____

Robert A. Bracken [ARGUED]
Bracken Law Firm
101 Smithfield Street
Suite 100
Pittsburgh, PA 15222
    *Counsel for Petitioner Miller Plastic Products Inc.*

Ruth E. Burdick
Jared D. Cantor [ARGUED]
Milakshmi V. Rajapakse
National Labor Relations Board
Appellate and Supreme Court Litigation Branch
1015 Half Street SE
Washington, DC 20570
    *Counsel for Cross-Petitioner National Labor
    Relations Board*

_____

OPINION OF THE COURT

_____

2

McKEE, *Circuit Judge.*

We are asked to review a decision and order of the National Labor Relations Board that resulted from Miller Plastic Products Inc.'s firing of Ronald Vincer in the early weeks of the COVID-19 pandemic. The NLRB determined that the firing occurred, at least in part, because Vincer had expressed concerns about Miller Plastic's COVID-19-related pandemic protocols and operating status. It therefore ruled that Vincer's termination violated Section 8(a)(1) of the National Labor Relations Act.[1] Miller Plastic petitions for review of the Board's order, and the Board cross-applies for enforcement.

For the reasons that follow, we conclude that substantial evidence supports the Board's determination that Vincer's conduct was protected under the NLRA and was a motivating factor for his termination. We also conclude that the Administrative Law Judge did not err in disallowing testimony regarding after-acquired evidence at the liability stage of the proceeding. We therefore deny Miller Plastic's petition for review in part and grant the Board's cross-application for enforcement in part, insofar as the Board asks us to affirm its finding that Vincer was terminated because of his concerted activity.

However, because the NLRB failed to adequately address certain evidence bearing on Miller Plastic's affirmative defense that it would have fired Vincer even absent his protected conduct, we will remand this case to the Board so

---

[1] 29 U.S.C. § 151 *et seq.*

3

that it may adequately address the significance (if any) of that evidence.

## I.     Factual Background[2]

Miller Plastic is a corporation with a plant in Burgettstown, Pennsylvania that manufactures plastic machining and fabrication products. In early 2020, Miller Plastic employed approximately twenty-six to thirty-three individuals at that plant. The employees included Ronald Vincer, who worked as a fabricator from 2015 until Miller Plastic fired him on March 24, 2020.

### a. Vincer's Performance

Vincer was generally considered "a highly skilled employee," but he "was also very social."[3] Vincer "would often talk with other employees at their work stations," especially his fellow fabricator, James Boustead.[4] Vincer also used his cellphone during working hours, despite a prohibition on cellphone use in the plant. While the company permitted some casual conversation among employees during work, management "periodically counseled Vincer about performance deficiencies, including excessive talking,

---

[2] The following account is drawn from the factual findings of the Board and, where the Board did not discuss certain events, from the findings of the ALJ.

[3] *Miller Plastic Prods., Inc.*, 372 N.L.R.B. No. 134, 2023 WL 5669331, at *1 (Aug. 25, 2023).

[4] *Id.* Boustead was still employed by Miller Plastic when he testified before the ALJ. The ALJ deemed Boustead "the most credible witness in this case." AR 462 n.12.

distracting coworkers, and using his cell phone."[5] One such counseling incident occurred on March 5, 2020. In addition, sometime in early 2020, management moved Boustead to a different workstation further away from Vincer's workstation to discourage Vincer from talking to and distracting Boustead.

Miller Plastic's written employee disciplinary policies include an "Employee Warning Report" form for documenting instances of discipline.[6] When it is used, the form is signed by the issuing supervisor and placed in the employee's file. At the hearing before the ALJ on Vincer's complaint, Miller Plastic moved into evidence three warning reports purportedly issued to Vincer on June 28, 2019, September 4, 2019 and January 15, 2020. These purported warnings described infractions such as talking and texting instead of working. However, the ALJ "did not give any weight" to these warning reports.[7] He characterized them as "dubious" because they were unsigned, whereas other warning reports issued to other employees were signed.[8] The Board adopted this reasoning with no further discussion. Thus, according to the ALJ and the Board, although Vincer was repeatedly "counseled" about his talking and cellphone use, he was never formally disciplined.[9]

### b. Onset of the COVID-19 Pandemic

The COVID-19 pandemic reached Pennsylvania in early 2020, and by March of that year it "was a frequent topic

---

[5] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *2.
[6] AR 460.
[7] *Id.* at 457–58 n.6.
[8] *Id.*
[9] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *2.

5

of conversation within the plant."[10]  Vincer spoke daily about the pandemic with Boustead.  Boustead was especially vulnerable to COVID-19 due to his preexisting medical conditions.  Vincer discussed his belief that Miller Plastic was not an essential business with at least four other colleagues.[11]  His belief that Miller Plastic was not an essential business and therefore should shut down caused him to suggest that someone should inform authorities that the plant remained open.

Pennsylvania Governor Tom Wolf responded to the pandemic by declaring a disaster emergency on March 6.  On March 16, Governor Wolf issued a stay-at-home order that required closure of non-life-sustaining businesses—but the March 16 order did not identify which businesses were "life-sustaining."[12]

---

[10] *Id.*

[11] "Essential businesses" or "life-sustaining businesses" refer to those businesses permitted to continue operating during certain phases of the COVID-19 pandemic when authorities ordered non-essential businesses to close.  *See* AR 460, 462.

[12] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *2.  The ALJ's opinion, the Board's opinion, and the parties' briefs all state that life-sustaining businesses were not identified by March 16.  The text of the order reproduced in the ALJ's opinion states that "[a] list of life sustaining businesses that may remain open is attached to and incorporated into this Order."  AR 461.  We note this apparent inconsistency but assume the accuracy of the factual finding that life-sustaining businesses were not clearly identified as of March 16, as no

### c. March 16: All-Hands Meeting

On March 16, Miller Plastic convened an "all-hands meeting."[13]  Chief Operating Officer Timothy Zeliesko led the meeting, joined by Plant Manager Blake Trenary.  Zeliesko explained that the company planned to stay open.  Because Miller Plastic's products were used for food and purified water, Zeliesko explained that he expected it to be classified as an essential business.  Several employees asked questions, and some expressed doubt about whether Miller Plastic would be categorized as an essential business.  Vincer was "upset" and explicitly disagreed with Zeliesko.[14]  He complained that Miller Plastic "did not have the proper precautions in place and that the employees should not be working."[15]

---

party has disputed it or come forward with evidence that such a list was appended to the order.

[13] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *2.

[14] *Id*.

[15] *Id.*  Although Vincer's statements are at the heart of this case, the record of what occurred is thin.  Vincer did not testify about the March 16 meeting, and of the two witnesses who did address it, Trenary was deemed not credible, and Boustead could not recall Vincer's statements.  Upon being shown his own previously drafted affidavit, Boustead agreed with the accuracy of the statement in the affidavit that Vincer "was upset, and he asked why we were still working when the employer was not an essential business," and stated that "he didn't think we had the proper precautions in place for the pandemic."  AR 206:1–5.  Although the ALJ deemed

On March 20, Governor Wolf's Office identified "plastic product manufacturing" as an essential business, meaning that Miller Plastic could remain open.[16] Zeliesko later sought and obtained specific confirmation from the Pennsylvania government that Miller Plastic was an essential business exempted from the Governor's closure order.

### d. March 23: Discussion of Return-to-Work Protocols

On March 23, Vincer learned that a colleague who had been sent home due to a potential COVID-19 exposure had returned to work two days later. Vincer approached Zeliesko on the floor of the plant and asked about the protocols for returning to work in such a situation. Zeliesko responded that he would have to get back to Vincer. Vincer next "asked Zeliesko if he thought the company should be open and operating."[17] Zeliesko responded that "[Miller Plastic] believed it was a life-sustaining business."[18] After that, "Vincer griped briefly and the conversation ended."[19]

Vincer later urged Boustead to raise concerns with management about Boustead's own health vulnerabilities and

Trenary's testimony not credible, the Board's factual summary quoted from Trenary's recollection that Vincer said, "we shouldn't be working." *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *2 & n.5.

[16] AR 464.

[17] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *2.

[18] *Id.*

[19] AR 464.

Miller Plastic's return-to-work protocols. Boustead responded by speaking to Trenary about his preexisting conditions. Trenary assured Boustead that Miller Plastic "would follow proper procedures, make anyone who came into contact with COVID stay home, and inform [Boustead] if he should get tested,"[20] presumably meaning that management would notify Boustead if he might have been exposed to the virus at work. Boustead subsequently testified that he was satisfied that the company was acting appropriately under the circumstances.

### e. March 24: Vincer's Termination

On March 24, Trenary again witnessed Vincer using his cellphone while on the floor of the plant.[21] Trenary reported the incident to Zeliesko, and the two went "[a]lmost immediately" to the company's owner, Donnie Miller, to recommend terminating Vincer.[22] Miller agreed. "Shortly thereafter," Miller, Zeliesko, and Trenary jointly informed Vincer that he was being fired "for poor attitude, talking, and lack of profit."[23] Vincer responded by arguing "that there were people worse than or slower than him," nodding towards his

---

[20] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *3.
[21] The ALJ recounted that "Trenary told Vincer to get off his cell phone and then observed Vincer walk away from his table as he continued talking on his cell phone." AR 471. Trenary testified that Vincer's termination was precipitated by more "talking and texting," which was "exacerbated by him walking 80 feet away from his workstation to now go talk to Mr. Boustead," and "not listening" when management instructed him to stop. *Id.* at 155:9–13.
[22] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *3.
[23] *Id.*

colleague, Christopher Cowger.[24] "Vincer then packed up his tools and left."[25]

### f. March 24–31: Additional Terminations

Swiftly on the heels of Vincer's termination, Miller Plastic fired three additional employees: Christopher Cowger on March 24; Eric Saloom on March 25; and David Onuska on March 31. While the Board did not comment on these other terminations, the ALJ discussed them and concluded that economic conditions contributed to Miller Plastic's decision to fire Vincer, Cowger, Saloom, and Onuska at the end of March. Miller Plastic's net operating income in January 2020 was lower than it had been the previous year by some $160,314, and management looked for ways to cut costs. Miller Plastic was interested in taking advantage of federal pandemic-relief programs to ease its financial burdens. In particular, the Paycheck Protection Program (PPP) offered loans to cover payroll expenses, but Miller Plastic was concerned that if it waited until after taking out a PPP loan to make any necessary terminations, the loan would not be forgiven.

## II. Procedural History

Vincer subsequently filed a charge with the Board alleging that Miller Plastic violated the NLRA by "discharg[ing] an employee[] because the employee[] engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage

---

[24] AR 466.
[25] *Id*.

10

employees from engaging in protected concerted activities."[26] The following day, the Board informed Miller Plastic that it was investigating the charge. That investigation resulted in the Board filing a complaint alleging that Miller Plastic had violated Section 8(a)(1) of the NLRA by discharging Vincer.[27]

Vincer, Boustead, Trenary, and Zeliesko testified at a hearing on the charge before an ALJ. At the hearing, Miller Plastic attempted to elicit testimony regarding information the company discovered after terminating Vincer. That testimony, if accepted, would have supported Miller Plastic's after-acquired-evidence defense. However, the ALJ did not permit this testimony. He explained that such evidence could not be considered in the merits phase of the case.

Thereafter, the ALJ issued a decision in which he found that Vincer and Boustead were credible witnesses, but that Trenary and Zeliesko were not. The ALJ held that Vincer had engaged in concerted activity for mutual aid or protection, and that this protected activity was the basis for Vincer's termination. Thus, the ALJ concluded that Miller Plastic had violated the NLRA by discharging Vincer. Miller Plastic and the Board's General Counsel filed exceptions and cross-exceptions to the ALJ's decision.

The Board issued a decision agreeing with the ALJ that Miller Plastic had violated the NLRA. The Board largely adopted the ALJ's factual findings, except for certain facial

---

[26] *Id.* at 331.
[27] *See* 29 U.S.C. § 158(a)(1).

errors and anomalies that it did not rely upon.[28]  But the Board upheld the ALJ's conclusion that Miller Plastic committed an unfair labor practice when it fired Vincer.  In reaching that conclusion, the Board purported to overrule its prior decision in *Alstate Maintenance, LLC*,[29] a key Board precedent related to evaluating "concerted activity."  The Board explained that it believed that *Alstate* had taken an "unduly restrictive" approach to defining "concerted activity."[30]  Rather than follow that approach, the Board resolved the complaint against Miller Plastic by applying a totality-of-the-evidence approach, which it had favored in its pre-*Alstate* decisions.[31]  However, the Board also noted that it would have found Vincer's conduct to be concerted even under the *Alstate* approach.[32]

_____

[28] *See Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *1 n.1 (explaining that the Board was not relying upon the ALJ's statements that Trenary "lacked credibility because, although he was no longer employed by [Miller Plastic], his roommate still worked for the company," and that "Vincer's conduct was 'inherently concerted,'" and noting an inaccurate quotation in the ALJ's opinion).
[29] 367 N.L.R.B. No. 68, 2019 WL 183862 (Jan. 11, 2019).
[30] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *3.
[31] *See id.* at *4 (discussing *Meyers Indus., Inc.*, 268 N.L.R.B. 493 (1984) ("*Meyers I*"); *Meyers Indus., Inc.*, 281 N.L.R.B. 882 (1986) ("*Meyers II*"); and *Worldmark by Wyndham*, 356 N.L.R.B. 765 (2011)).
[32] *Id.* at *11 n.22.  One Board member concurred in the result but disagreed with the portion of the decision purporting to overrule *Alstate*.  *Id.* at *14.  The concurring Board member characterized the discussion of *Alstate* as dicta because all

12

The Board concluded that Vincer's conduct had been concerted because (i) his comments at the March 16, 2020 meeting "sought to bring 'truly group complaints to the attention of management,'"[33] and (ii) his subsequent conversation with Zeliesko about return-to-work protocols on March 23 "was a 'logical outgrowth'" of the comments at the March 16 meeting.[34]

The Board adopted without further analysis the ALJ's findings that Vincer's conduct was for mutual aid or protection, that the protected conduct was a motivating factor in Vincer's discharge, and that Miller Plastic failed to prove that it would have discharged Vincer even absent the protected conduct. In addition to other relief, the Board ordered Miller Plastic to offer Vincer reinstatement to his former job and make him whole for pecuniary harms resulting from the unfair labor practice.

### III. Discussion

The Board had jurisdiction over this matter pursuant to 29 U.S.C. § 160(a). We have jurisdiction to review the Board's order pursuant to 29 U.S.C. §§ 160(e) and (f).

---

three Board members agreed that Vincer's conduct was concerted even under *Alstate*.
[33] *Id.* at *11 (quoting *Meyers II*, 281 N.L.R.B. at 887).
[34] *Id.* (quoting *Mike Yurosek & Son, Inc.*, 306 N.L.R.B. 1037, 1038–39 (1992)).

13

We exercise plenary review over questions of law and the Board's application of legal principles.[35]  We retain ultimate responsibility to "determin[e] the meaning of statutory provisions,"[36] though we may look to the Board's interpretations as "a body of experience and informed judgment."[37]  We rely upon the Board's factual findings so long as "they are supported by substantial evidence, that is, 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion.'"[38]  To the extent that the Board adopts the ALJ's findings and conclusions, we also review the ALJ's decision.[39]

Miller Plastic challenges the Board's determination that Vincer engaged in protected concerted activity.  That requires us to determine the correct legal test for identifying concerted activity and the application of that test here.  In doing so, we inquire into whether Vincer acted for mutual aid or protection.  Miller Plastic also contends that the evidence does not support the conclusion that Vincer's conduct was a motivating factor in Vincer's termination even if it falls within the scope of the NLRA.  Miller Plastic challenges the finding that Miller Plastic failed to prove it would have fired Vincer even absent the

---

[35] *NLRB v. Starbucks Corp.*, 125 F.4th 78, 86 (3d Cir. 2024).
[36] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024).
[37] *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).
[38] *Starbucks Corp.*, 125 F.4th at 86 (quoting *NLRB v. ImageFIRST Unif. Rental Serv.*, 910 F.3d 725, 732 (3d Cir. 2018)).
[39] *Id.*

protected activity. Finally, Miller Plastic argues that the ALJ should have permitted it to elicit testimony regarding its after-acquired-evidence defense. We address these arguments in turn.

### a. Whether Vincer's Conduct was "Concerted Activity" Protected by the NLRA

Section 7 of the NLRA protects the rights of employees "to self-organiz[e], to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in *other concerted activities* for the purpose of collective bargaining *or other mutual aid or protection*."[40] Thus, if an employee's conduct is concerted in service of mutual aid or protection, it falls within the ambit of Section 7.

### 1. The Meaning of "Concerted Activities"

The NLRA does not define "concerted activities," but the phrase "clearly enough embraces the activities of employees who have joined together in order to achieve common goals."[41] Beyond this, federal courts and the Board

---

[40] 29 U.S.C. § 157 (emphasis added).
[41] *MCPc, Inc. v. NLRB*, 813 F.3d 475, 482 (3d Cir. 2016) (quoting *NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 830 (1984)).

have long agreed that conduct by a single employee can be "concerted" if it is sufficiently related to group concerns.[42]

Until recently, we were required to defer to the Board's reasonable interpretations of ambiguous terms in the NLRA pursuant to *Chevron, USA, Inc. v. Natural Resources Defense Counsel*.[43]  However, the Supreme Court overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*.[44]  There, the Court held that federal courts must independently interpret statutory text.[45]  Nevertheless, we acknowledge that the Board's construction of the phrase "concerted activity" has shaped our jurisprudence over the years.  Moreover, *Loper Bright* did not necessarily displace our earlier precedents merely because they

---

[42] *City Disposal Sys. Inc.*, 465 U.S. at 832; *MCPc, Inc.*, 813 F.3d at 483; *Meyers II*, 281 N.L.R.B. at 887.
[43] 467 U.S. 837 (1984).  *See, e.g.*, *NLRB v. N.J. Bell Telephone Co.*, 936 F.2d 144, 147 (3d Cir. 1991) ("Our review of the Board's construction of the National Labor Relations Act is guided by *Chevron . . . .*").
[44] 603 U.S. at 412.
[45] *See id.* at 398–401.  *But see Alaris Health at Boulevard E. v. NLRB*, 123 F.4th 107, 121 (3d Cir. 2024) (identifying without resolving "an open question" as to whether some level of non-*Chevron* deference to the Board's "classifications of" phrases in the NLRA survives *Loper Bright*).  As in *Alaris Health*, we need not here resolve whether any deference attaches to the Board's assessment of what constitutes concerted activity.  For the reasons explained below, even on plenary review, we agree with the Board's understanding of "concerted activity" as articulated in the *Meyers* cases and their progeny.

were guided by *Chevron*.[46] Given the Board's expertise in matters governed by the NLRA, the Board's assessment of what constitutes "concerted activities" continues to form "a body of experience and informed judgment" that can aid our analysis.[47] We therefore find it helpful to begin by considering the evolution of the Board's analysis of the concept of concerted activity. Certain core principles emerge from that historical analysis.

**i.**

Congress enacted the NLRA in 1935, incorporating the phrase "concerted activities" from a predecessor statute, the Norris-LaGuardia Act of 1932.[48] In the decades that followed, the Board analyzed concerted activity primarily by "considering whether some kind of group action occurred."[49] Certain early decisions acknowledged that interactions "involv[ing] only a speaker and a listener" could be concerted, "for such activity is an indispensable preliminary step to employee self-organization."[50] However, the Board in this era

---

[46] *See Loper Bright*, 603 U.S. at 412 (explaining that "prior cases that relied on the *Chevron* framework . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology").

[47] *Id.* at 394 (quoting *Skidmore*, 323 U.S. at 140).

[48] *City Disposal Sys. Inc.*, 465 U.S. at 834–35 (discussing history of the phrase "concerted activity"); *see also Meyers II*, 281 N.L.R.B. at 883.

[49] *Meyers I*, 268 N.L.R.B. at 494; *see also id.* at 494 n.7 (collecting cases).

[50] *Root-Carlin, Inc.*, 92 N.L.R.B. 1313, 1314 (1951).

17

primarily "define[d] concerted activity in terms of employee interaction in support of a common goal."[51]

The Board altered this approach in its 1975 ruling in *Alleluia Cushion Co., Inc.*[52] There, it ruled that a solo employee's complaint could be concerted even in "the absence of any outward manifestation of support" from other employees, so long as the lone employee was raising an issue "of great and continuing concern for all within the work force."[53] In *Alleluia Cushion*, the Board held that safety complaints by a single employee were "concerted" because they invoked a right recognized in the Occupational Safety and Health Act.[54] The Board reasoned that in enacting OSHA, Congress had declared "minimum safe and healthful employment conditions . . . to be in the overall public interest."[55] Thus, "in the absence of any evidence that fellow employees disavow such representation" when a single employee invokes a statutory right in the interest of all employees, the Board would "find an implied consent thereto and deem such activity to be concerted."[56]

Nine years later, in *Meyers I*, the Board overruled *Alleluia* as "at odds with the [NLRA]" because it analyzed

---

[51] *Meyers I*, 268 N.L.R.B. at 494 (discussing *Traylor-Pamco*, 154 N.L.R.B. 380 (1965), and *Continental Mfg. Corp.*, 155 N.L.R.B. 255 (1965)).

[52] 221 N.L.R.B. 999 (1975).

[53] *Id.* at 1000.

[54] *Id.*

[55] *Id.*

[56] *Id.*

18

concerted activity according to the Board's subjective evaluation of the issue raised, rather than an objective manifestation of group concern.[57] The Board in *Meyers I* purported to be returning to "the standard on which the Board and courts relied before *Alleluia*"[58]: that conduct is "concerted" if it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself."[59] Applying this standard, the Board held that an employee who refused to drive an unsafe vehicle was not engaged in concerted activity because he "acted solely on his own behalf," notwithstanding that government safety regulations validated the concern he raised as a matter of public importance.[60]

While *Meyers I* was being appealed, the Supreme Court in *City Disposal Systems* endorsed the notion that a lone employee's conduct may be "concerted" within the meaning of the NLRA when it grows out of group activity.[61] That case also involved an employee who objected to driving an unsafe vehicle.[62] Importantly, in *City Disposal Systems*, the right not to drive an unsafe vehicle was enshrined in an applicable collective-bargaining agreement.[63] This made the refusal to drive a concerted act, the Supreme Court explained, because enforcing the right was integral to, and an extension of, the quintessentially group "process that gave rise to the

---

[57] 268 N.L.R.B. at 496.
[58] *Id.*
[59] *Id.* at 497.
[60] *Id.* at 498.
[61] 465 U.S. at 831.
[62] *Id.* at 824.
[63] *Id.* at 824–25.

19

agreement."[64]  Thus, the lone employee's refusal to drive the vehicle was tantamount to "reassembling his fellow union members to reenact their decision not to drive unsafe trucks."[65]

The Court of Appeals for the D.C. Circuit subsequently reviewed *Meyers I* in *Prill v. NLRB*.[66]  The court in *Prill* concluded that the Board had erroneously construed the NLRA as *requiring* the definition of "concerted activity" articulated in *Meyers I*.[67]  The D.C. Circuit Court wrote that the NLRA endowed the Board with broad discretion to "determine the scope of [Section 7] in light of its own policy judgment and expertise" to effectuate the purposes of the NLRA.[68]  *Prill* contrasted *Meyers I*'s conclusion that "conduct [must] be actually concerted"[69] with commentary in *City Disposal Systems* that Congress did not "intend[] to limit [Section 7] to situations in which an employee's activity and that of his fellow employees combine with one another in any particular way."[70]  The court in *Prill* therefore remanded *Meyers* to the Board with instructions to reconsider the scope of concerted activity in light of the Board's broad latitude and the Supreme Court's intervening decision in *City Disposal Systems*.[71]

---

[64] *Id.* at 831.

[65] *Id.* at 832.

[66] 755 F.2d 941 (D.C. Cir. 1985).

[67] *Id.* at 942.

[68] *Id.* at 950.

[69] *Id.*

[70] *Id.* at 952 (quoting *City Disposal Sys. Inc.*, 465 U.S. at 835).

[71] *Id.* at 957.

On remand, the Board in *Meyers II* reaffirmed the definition of concerted activity set forth in *Meyers I*, that is, activity "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself."[72] The Board explained that this definition "encompasses those circumstances where individual employees seek to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management."[73] But the Board emphasized that the limiting principle of *Meyers I*—that concerted activity does not occur when an employee acts solely for her or himself—was important to give meaning to the requirement of concerted activity, separate and apart from whether the action served the employees' "mutual aid or protection."[74] Thus, according to the Board in *Meyers II*, *Alleluia* remained wrongly decided, notwithstanding *City Disposal Systems*, because the right invoked in *Alleluia* was a statutory right that did not grow out of any underlying group action.[75]

## ii.

Since deciding *Meyers II*, the Board has continued to invoke the *Meyers* definition, but it has inconsistently applied

---

[72] *Meyers II*, 281 N.L.R.B. at 885 (quoting *Meyers I*, 268 N.L.R.B. at 497).
[73] *Id.* at 887.
[74] *Id.*
[75] *Id.* at 887–88.

21

it.  In *Worldmark by Wyndham*,[76] the Board wrote that the principles of *Meyers* mean that "an employee who protests publicly in a group meeting is engaged in initiating group action."[77]  On this premise, the Board held that an employee engaged in concerted activity by questioning his supervisor about a new dress code in front of other employees.[78]  The facts supporting this conclusion included that the employee "took the first opportunity to question a newly announced rule" affecting himself and his colleagues, "[h]e did so in the presence of several colleagues," he used words that "cast his complaint in group terms" such as "we" and "us," and a second employee joined in the protest.[79]

Eight years later, in *Alstate*, the Board overruled *Worldmark*.[80]  The Board explained that *Worldmark* had deviated from the *Meyers* standard by blurring the distinction between group and individual action.[81]  The Board in *Alstate* stressed that *Meyers II* requires decisionmakers to evaluate concerted activity as "a factual [question] based on the totality of the record evidence."[82]  The Board therefore criticized

---

[76] 356 N.L.R.B. 765.  This case is reported as *Wyndham Resort Development Corp, d/b/a Worldmark by Wyndham*. Because this case is referred to in other Board and court decisions as *Worldmark by Wyndham*, we refer to it in that same manner here.

[77] *Id.* at 766.

[78] *Id.* at 767.

[79] *Id.* at 766 (emphasis omitted).

[80] 2019 WL 183862, at *1.

[81] *Id.* at *1, *6.

[82] *Id.* at *7 (quoting *Meyers II*, 281 N.L.R.B. at 886).

*Worldmark* for purportedly announcing a per-se rule that "an employee who protests publicly in a group meeting *is* engaged in initiating group action."[83]  The Board in *Alstate* concluded by identifying five "relevant factors that would tend to support" an inference that "the employee was seeking to initiate, induce or prepare for group action"[84]:

(1) the statement was made in an employee meeting called by the employer to announce a decision affecting wages, hours, or some other term or condition of employment; (2) the decision affects multiple employees attending the meeting; (3) the employee who speaks up in response to the announcement did so to protest or complain about the decision, not merely (as in *WorldMark*) to ask questions about how the decision has been or will be implemented; (4) the speaker protested or complained about the decision's effect on the work force generally or some portion of the work force, not solely about its effect on the speaker him- or herself; and (5) the meeting presented the first opportunity employees had to

---

[83] *Id.* (quoting *Worldmark*, 356 N.L.R.B. at 766).
[84] *Id.* at *8.

> address the decision, so that the speaker had no opportunity to discuss it with other employees beforehand.[85]

This seemingly formulaic approach to interpreting concerted activity was short-lived. A few years later, in reviewing the case before us, the Board purported to overrule *Alstate*. The Board criticized the approach taken in *Alstate* because it "cast aside th[e] holistic approach" of *Meyers II*, adopting instead "a checklist of factors that imposed significant and unwarranted restrictions on what constitutes concerted activity."[86] Rejecting a mechanical analysis of the *Alstate* factors, the Board wrote that *Alstate* had "fundamentally misconstrued" *Worldmark*, which "neither established nor applied a per se rule," but instead merely recognized that a statement made in front of coworkers could, "in combination with other relevant facts," suggest an intent to induce group action.[87] In other words, *Worldmark* had correctly followed the facts-and-circumstances approach required by *Meyers II* and its progeny.[88] As for the requisite nexus to group action, the Board majority wrote that the disputed employee conduct need not "derive[] from group action," so long as the lone employee "appear[ed]" to be acting

---

[85] *Id.*
[86] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *5.
[87] *Id.* at *6.
[88] *Id.*

24

to induce group action or with "some relation to group action."[89]

### iii.

Even though the Board has purported to reverse itself, the principles articulated in *Meyers I* and *Meyers II* consistently emerge from this line of cases. They have guided the Board's inquiry since its earliest pronouncements, even during the superficially tumultuous rulings before and shortly after *Alstate*.[90] It is therefore clear to us that concerted activity occurs when a lone employee acts "not solely . . . on behalf of the employee himself,"[91] but by "seek[ing] to initiate or to induce or to prepare for group action . . . *[or by] bringing truly group complaints to the attention of management*."[92]

Obviously, Congress did not intend when it enacted the NLRA to enable every employee to make the proverbial federal case out of every discontentment or displeasure that

---

[89] *Id.* at \*8 (emphasis omitted) (quoting *Meyers II*, 281 N.L.R.B. at 887).

[90] *See id.* at \*10 (applying and "reaffirm[ing] the fundamental principle of *Meyers II*"); *Alstate Maintenance*, 2019 WL 183862, at \*4 (stating that the Board was "[a]pplying the *Meyers II* standard"); *Worldmark*, 356 N.L.R.B. at 766 (describing *Meyers II* as the "lead case on concerted activity" and finding the at-issue conduct concerted in light of cases "[a]pplying those [*Meyers*] principles").

[91] *Meyers II*, 281 N.L.R.B. at 885 (quoting *Meyers I*, 268 N.L.R.B. at 497).

[92] *Id.* at 887 (emphasis added).

may arise in the course of his or her employment.[93]  Rather, the focus was clearly on the nexus between an employee complaint or action and "the terms and conditions of their employment."[94] Thus, a complaint that shoes furnished by an employer were uncomfortable would probably not be the kind of complaint that could be distinguished from a lone employee's gripe. However, complaints that protective shoes furnished by an employer were of such poor quality that they failed to protect employees from injury might well come within the ambit of the NLRA.

The Board's resolution of Vincer's complaint clarifies that the Board will not be formulaically restricted to the *Alstate* criteria in determining whether such surrounding circumstances cloak Vincer's conduct with the protection of the NLRA.  Rather, the Board announced that it was returning to the "holistic" approach of *Meyers I* and its progeny.  As explained above, that inquiry turns on whether an employee's

---

[93] *See Mushroom Transp. Co. v. NLRB*, 330 F.2d 683, 685 (3d Cir. 1964) (rejecting the notion "that any conversation between employees comes within the ambit of activities protected by the Act provided it relates to the interests of the employees"); *Meyers II*, 281 N.L.R.B. at 883 & n.16 (collecting cases to support that "protection for *joint* employee action . . . lies at the heart of the Act") (emphasis added).

[94] *City Disposal Sys. Inc.*, 465 U.S. at 835 (describing Congress's intent "to equalize the bargaining power . . . by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment").

conduct benefitted the group "and [was] not solely by and on behalf of the employee himself."[95] The five-prong inquiry in *Alstate* was nothing more than an attempt to provide a recipe for determining if an employee's complaint was more than an individual gripe.[96] Viewed in this light, *Meyers I* and its progeny simply recognize that the inquiry into whether an employee's conduct comes within the scope of the NLRA must encompass all of the surrounding circumstances and cannot be limited only to those identified in *Alstate*.[97] For convenience and clarity, we reiterate those five factors in the margin.[98]

---

[95] *Meyers I*, 268 N.L.R.B. at 497.

[96] *Alstate Maintenance*, 2019 WL 183862, at *7 (faulting *Worldmark* for having "un-moored itself from *Meyers Industries*" by failing to "treat[] the question of whether an individual employee has engaged in concerted activity as 'a factual one based on the totality of the record evidence'") (quoting *Meyers II*, 281 N.L.R.B. at 886); *id.* at *8 n.45 (clarifying that the five identified factors are "not necessary elements" and that concerted activity could be established based on other facts as well).

[97] *See Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *10 ("[T]he question of whether an employee has engaged in concerted activity is a factual one based on the totality of the record evidence.") (quoting *Meyers II*, 281 N.L.R.B. at 886); *Worldmark*, 356 N.L.R.B. at 766 (cataloguing specific facts of case to support conclusion that employee "intended to induce group action").

[98] "(1) the statement was made in an employee meeting called by the employer to announce a decision affecting [a] . . . term or condition of employment; (2) the decision affects multiple

27

Thus, given the necessarily highly circumstantial nature of the inquiry into concerted activity, there is no ironclad requirement that employees coordinate before raising concerns to management even if there is an opportunity to do so.[99] Similarly, it is not necessary that multiple employees even be present for the discussion with management.[100] Those are, however, factors to be considered. Nevertheless, there must be

employees . . . ; (3) the employee who speaks up . . . did so to protest or complain about the decision, not merely . . . to ask questions about how the decision . . . will be implemented; (4) the speaker protested or complained about the decision's effect on the work force generally . . . not solely about its effect on the speaker him- or herself; and (5) . . . the speaker had no opportunity to discuss it with other employees beforehand." *Alstate Maintenance*, 2019 WL 183862, at *8.

[99] *See Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *10 (emphasizing that an employee "may choose to confront their employer . . . before discussing the matter with coworkers," and doing so "will not detract from their intent to induce group action"); *Alstate Maintenance*, 2019 WL 183862, at *8 (describing circumstance in which statements could be concerted even though "the speaker had no opportunity to discuss it with other employees beforehand"); *Worldmark*, 356 N.L.R.B. at 767 ("[I]t is irrelevant that [two employees] did not agree in advance to protest together.").

[100] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *4 (noting that *Meyers II* made clear "that activity that at inception involves only a speaker and a listener can be concerted"); *Alstate Maintenance*, 2019 WL 183862, at *3 (same).

evidence of some activity or discussion that imbues the concern with a "truly group" character.[101] The NLRA and the protections it affords are just that: *protections*. The Act was intended as a shield and not as a sword that an employee could use to bludgeon an employer with individual (and perhaps petty) complaints that would otherwise be dismissed as "mere griping."[102]

Accordingly, we recently explained in *MCPc, Inc. v. NLRB* that, consistent with *Meyers II*, we "recognize[] individual conduct as 'concerted' both where 'individual employees seek to initiate or induce or to prepare for group action' and where 'individual employees bring[] truly group

---

[101] *See Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *8 (explaining that while a solo complaint need not derive from group action, "it must appear at the very least it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees") (quoting *Meyers II*, 281 N.L.R.B. at 887) (emphasis omitted); *Alstate*, 367 N.L.R.B. at *3 (discussing evidence to establish that individual employee "is acting other than solely by and on behalf of him- or herself"); *Worldmark*, 356 N.L.R.B. at 766 (discussing evidence to show employee is "engaged in initiating group action").
[102] *MCPc, Inc.*, 813 F.3d at 483 (discussing *Mushroom Transp. Co.*, 330 F.2d at 6833, 685); *see also id.* at 488 (explaining that the NLRA does not undermine an "employer's general freedom" to discharge an employee . . . 'so long as the terms of the [Act] are not violated'") (quoting *Meyers I*, 268 N.L.R.B. at 497 n.23).

29

complaints to the attention of management.'"[103] But we reiterated that "mere griping" is not protected,[104] and the presence of other employees as spectators does not transform a solo complaint (i.e., an individual gripe) into something concerted.[105] However, absent evidence of coordination among employees, evidence that other employees share the same concern can distinguish between a solo complaint and a truly group concern.[106] Thus, *MCPc* described "the touchstone for an individual's concerted activity" as "whether the employee intends to induce group activity or whether the employee's action bears some relation to group action in the interest of the employees."[107]

Importantly, this view of concerted activity does not require the lone employee to have succeeded in galvanizing colleagues to act alongside him/her. For reasons that should be obvious, the NLRA must protect successful attempts to raise group concerns as well as unsuccessful attempts to do so.[108]

---

[103] *Id.* at 483 (quoting *Meyers II*, 281 N.L.R.B. at 887).

[104] *Id.* (quoting *Mushroom Transp. Co.*, 330 F.2d at 685).

[105] *Id.* at 484–85.

[106] *See id.* at 485 ("any doubt" as to group nature of lone employee's complaint was "dispelled" when other employees expressed agreement).

[107] *Id.* at 484.

[108] *See Mushroom Transp. Co.*, 330 F.2d at 685 (explaining that "preliminary discussions" can be protected, for concerted activity "has to start with some kind of communication" and "it would come very near to nullifying the rights . . . guaranteed by Section 7 . . . if such communications are denied protection because of lack of fruition").

Otherwise, an employer would be free to get rid of a "troublesome" employee before s/he had a chance to bring a legitimate group concern to the attention of other employees. And this would reward any employer that creates a coercive and intimidating atmosphere in which other employees would be fearful of risking their jobs by speaking up.[109] Congress clearly did not intend to create such perverse incentives as would arise from a narrow interpretation of "concerted activity."

As courts repeatedly have recognized, concerted activity should not be limited to activities in which multiple employees directly participate, for lone employees can inspire or otherwise contribute to group action in ways that vindicate the goals of the NLRA.[110] And employers should not be free to get rid of employees before they have had a chance to bring their group concerns to the attention of others. Nevertheless, Section 7 only protects the actions of a lone employee if s/he seeks to induce group action or raises a truly group concern.

---

[109] *Cf. Jeannette Corp. v. NLRB*, 532 F.2d 916, 918 (3d Cir. 1976) (holding an employer's rule prohibiting wage discussion among employees "prima facie violative of [the NLRA]" because "higher wages are a frequent objective of organizational activity, and discussions about wages are necessary to further that goal").

[110] *See City Disposal Sys. Inc.*, 465 U.S. at 835 ("There is no indication that Congress intended to limit [Section 7's] protection to situations in which an employee's activity and that of his fellow employees combine with one another in any particular way.").

## 2. The Concerted Nature of Vincer's Conduct

Applying the foregoing principles to this appeal, substantial evidence supports the Board's determination that Vincer, in speaking up about pandemic-safety measures under the circumstances here, "sought to bring 'truly group complaints to the attention of management.'"[111] Although this record does not establish that group action resulted from Vincer's complaints about Miller Plastic remaining open, it does not have to. As we have noted, the law protects concerted activity whether or not that activity is successful. Vincer spoke out about safety concerns arising from the deadly COVID-19 pandemic. He spoke to others in an effort to have his employer close during the pandemic because of his COVID-19-related fears. In addition to speaking out at the group meeting, he also encouraged at least one employee—Boustead—to raise pandemic-safety concerns directly with management. The fact that no significant group action followed Vincer's activity does not change the nature of his conduct.

### i.

This record establishes that the pandemic was a topic of discussion in the plant generally, but also that Vincer's views and statements on pandemic-safety issues made him an outlier among his colleagues.[112] Although there is no evidence that

___

[111] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *11 (quoting *Meyers II*, 281 N.L.R.B. at 887).

[112] *See* AR 205:13–14 (Boustead reading previously submitted declaration that "Vincer complained more than

any employees authorized Vincer to speak on their behalf, Boustead testified that at the March 16 all-hands meeting, "there was [*sic*] several people more than Mr. Vincer stating that we were not an essential business."[113]  The ALJ and the Board relied upon this testimony in their factual findings.  This testimony was from the witness that the ALJ deemed "most credible,"[114] and it provides evidence "that a reasonable mind might accept as adequate to support [the] conclusion"[115] that at least some other employees agreed with Vincer's assertion that "we shouldn't be working."[116]  This goes beyond "merely complaining in a group setting."[117]  There were plausible reasons to disagree with Miller Plastic's decision to remain open: Governor Wolf had ordered non-life-sustaining businesses to close but had not identified which businesses were life-sustaining.  It is clear that other employees shared Vincer's concerns about their employer remaining open during a life-threatening pandemic so severe that the state's governor had ordered non-essential businesses to close.

---

other employees about COVID-19 concerns"); *id.* at 227:15–16 (Boustead testifying that "a majority of [Vincer's statements] would be his own personal concerns"); *id.* at 234:14–15 (Boustead testifying that "[Vincer] was expressing more concerns than other employees.").

[113] *Id.* at 203:24–25.

[114] AR 462 n.12.

[115] *Starbucks Corp.*, 125 F.4th at 86 (quoting *ImageFIRST Unif. Rental Serv.*, 910 F.3d at 732).

[116] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *11.

[117] *MCPc, Inc.*, 813 F.3d at 484.

In *MCPc* we explained that concerted activity can occur when one employee "expresses grievances to management about a matter of general employee interest in a group meeting context,"[118] even "without the imprimatur of other employees."[119] There, during a team-building lunch, an employee told a manager that he was working too many hours, urged the manager to hire additional engineers, and cited the high salary of a recently hired executive as evidence that the company could afford additional hires.[120] Other employees at the lunch agreed.[121] We explained that this was protected concerted activity because the lunch "provided a group forum within which [the employee] could relay to management complaints shared by other employees about workplace conditions they wished to see improved," and other employees spoke up in agreement, demonstrating the group nature of the concern.[122]

Vincer's conduct carries the same indicia of being concerted as the conduct that qualified for protection under the NLRA in *MCPc*. Vincer used the "group forum"[123] of the March 16 all-hands meeting to bring concerns about the plant's operating status to management. These concerns revolved

---

[118] *Id.*

[119] *Id.* at 483.

[120] *Id.* at 479.

[121] *Id.*

[122] *Id.* at 485. However, as we have explained, it is not imperative that other employees voice agreement with a complaint for that speaker to be protected by the NLRA.

[123] *Id.*

around "workplace conditions"[124]—pandemic-safety measures. And, as discussed above, the record supports that at least some employees openly shared Vincer's belief that Miller Plastic would not be designated essential. Vincer even went a step further than the employee in *MCPc* when he convinced Boustead to speak to management about workplace safety.[125]

The facts here differ somewhat from those in *MCPc* because there, other employees expressed agreement *after* the first employee spoke up, effectively ratifying the concern in the group setting. This case is the inverse. Other employees said the plant was not an essential business, and they appear to have said so *before* Vincer spoke up. However, that distinction does not undermine the group nature of Vincer's complaint. In *MCPc*, other employees' subsequent agreement was important to establish the group nature of the grievance. Here, however, this is otherwise established through Boustead's credited testimony that at the March 16 all-hands meeting, there were "several people more than Mr. Vincer stating that we were not an essential business."[126] As the Board summarized, "the emerging pandemic was a frequent topic of conversation within the plant" even before the March 16 meeting, and at that meeting, "[s]everal other employees also raised questions regarding whether [Miller Plastic] qualified as an essential business."[127]

---

[124] *Id.*
[125] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *3.
[126] AR 203:24–25.
[127] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *2.

## ii.

Vincer raised the same issues again in his one-on-one conversation with Zeliesko on March 23. He asked Zeliesko "if he [Zeliesko] thought the company should be open and operating."[128] This conveyed that Vincer disagreed with the decision to remain open. We agree with the Board that this was an extension of his March 16 effort to bring this group concern to the attention of management.[129]

Miller Plastic argues that questioning management cannot constitute concerted activity. It challenges the Board's decision to overrule *Alstate* in this respect.[130] As we have explained above, we do not think that *Alstate* is categorically irreconcilable with the approach the Board espoused in this case. In *Alstate*, the Board contrasted a situation in which an employee speaks up "to protest or complain about [a] decision," which it said would be indicative of concerted activity, with a situation in which an employee speaks up "merely . . . to ask questions."[131] On review in this case, the

---

[128] *Id.* Zeliesko's testimony, which appears to be the basis for the Board and ALJ's findings, formulated the question still more provocatively: "[D]o you think we should even be open?" AR 48:25–49:1.

[129] *See Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *11.

[130] As we noted above, the Board would have found concerted activity here even under *Alstate*. *See id.* at *11 n.22. This strongly suggests that even under *Alstate*, the fact that an employee communicates via a question does not preclude a finding of concerted activity.

[131] 2019 WL 183862, at *8.

Board opined that "asking questions is frequently an indirect way of criticizing and drawing others to oppose a new policy."[132]

We disagree with the notion that asking questions is inherently inconsistent with seeking to induce group action or raise group complaints. Common experience establishes that whether or not a question is actually an assertion depends on context. For example, a statement like "are you really serious about that" may well be nothing more than an expression of disagreement. But it could also be a way of disparaging the listener's position (i.e., "you can't be serious?"). As we have explained and as our decision in *MCPc* made clear, concerted activity must be assessed in context of the totality-of-the-evidence.[133] Circumstances simply should not be ignored in determining when activity is concerted under the NLRA. *MCPc* explicitly rejected restricting concerted activity to "exclusive categories" of recognized conduct.[134] Moreover, our sister circuit courts of appeals agree that a question can be posed in a manner that conveys concern about working conditions.[135]

---

[132] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *10.
[133] 813 F.3d at 486.
[134] *Id.* at 484.
[135] *See, e.g.*, NLRB v. Caval Tool Div., 262 F.3d 184, 189–90 (2d Cir. 2001) (finding employee's questions and comments "directed at an announced change in the terms and conditions of employment" were concerted); *NLRB v. Talsol Corp.*, 155 F.3d 785, 797 (6th Cir. 1998) (agreeing that questions in a "group meeting" about "the safety of the plant" furthered a

The Board could certainly consider a question and the circumstances in which Vincer posed it in assessing concerted activity under the holistic approach of *Meyers* and its progeny, as well as assessing it as one of the factors set out in *Alstate*. Indeed, the Board suggested that it had conducted just such an inquiry here when it noted that it would have also found concerted activity under the *Alstate* framework.[136]

We therefore conclude that substantial evidence supports the Board's conclusion that Vincer's statements at the March 16 all-hands meeting raised a "truly group complaint" with management, and thus, constitute concerted activity under the NLRA. Vincer's March 23 conversation with Zeliesko was an extension of his effort to raise that same group concern.[137]

---

common interest and were concerted within the meaning of Section 7).

[136] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *11 n.22.

[137] *See City Disposal Sys. Inc.*, 465 U.S. at 831–32 (explaining that Section 7 covers distinct actions that together represent "a single, collective activity"); *see also NLRB v. Mike Yurosek & Son, Inc.*, 53 F.3d 261, 266 (9th Cir. 1995) (reasoning that a lone act can be concerted if it is "a logical outgrowth of prior concerted activity" (internal quotation marks omitted)).

### 3. Vincer's Conduct was for "Mutual Aid or Protection"

There is also substantial evidence that Vincer's concerted activity was for the purpose of "mutual aid or protection."[138]  The Board adopted the ALJ's finding that Vincer acted in service of mutual aid or protection because he raised concerns about workplace safety, and those concerns affected all employees.  We agree.  The facility's operating status during the pandemic impacted the working conditions of all employees.[139]  Vincer's statements and conduct reveal a belief that shutting down the facility, or alternatively implementing more stringent quarantine protocols if it remained open, was necessary to ensure employee safety.  Thus, he raised concerns "to improve conditions of employment."[140]  And there is no suggestion that Vincer's conduct was "unlawful, violent, or in breach of contract" so as to otherwise "fall outside the shelter of § 7."[141]

---

[138] 29 U.S.C. § 157.

[139] *See Wheeling-Pittsburgh Steel Corp. v. NLRB*, 618 F.2d 1009, 1018 (3d Cir. 1980) (explaining "mutual aid or protection" element satisfied where employees were motivated by "concern for the safety of the other employees, as well as themselves").

[140] *MCPc, Inc.*, 813 F.3d at 486 (citing *Asplundh Tree Expert Co. v. NLRB*, 365 F.3d 168, 172 n.3 (3d Cir. 2004)).

[141] *Id.* (quoting *Wheeling-Pittsburgh Steel Corp.*, 618 F.2d at 1018).

### b. Whether Vincer was Fired Because of his Protected Conduct

An employer violates the NLRA if it "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of the rights guaranteed" in Section 7,[142] including by firing an employee for engaging in protected concerted activity.[143] The Board adopted, without analysis or discussion, the ALJ's conclusion that Miller Plastic violated Section 8(a)(1) by discharging Vincer because of his protected concerted activity. Miller Plastic contends that there is insufficient evidence to support this conclusion and that it terminated Vincer for reasons unrelated to his COVID-19 inquiry, namely, poor job performance.

Where the parties present competing explanations for a termination, we apply the test established by the Board in *Wright Line*,[144] which the Supreme Court approved in *NLRB v. Transportation Management Corp*.[145] "Under this test, if the [Board] makes a prima facie showing that protected conduct was a motivating factor in the employer's decision, the burden

---

[142] 29 U.S.C. § 158(a)(1).

[143] *See NLRB v. Omnitest Inspection Servs*., 937 F.2d 112, 122 (3d Cir. 1991) ("The Act prohibits an employer from discharging an employee because of union membership or activities.").

[144] 251 N.L.R.B. 1083 (1980), *enforcement denied*, 662 F.2d 889 (1st Cir. 1981), *abrogated by NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983).

[145] 462 U.S. at 397–404, *abrogated in part on other grounds by Dir., Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267 (1994).

shifts to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct."[146]

### 1. *Wright Line* Step 1: The Board's Burden

The Board may rely on circumstantial evidence to meet its burden under *Wright Line*.[147]  We agree with Miller Plastic that there is no evidence of explicit animus toward Vincer's protected conduct.  We therefore need to consider whether the totality of circumstances surrounding Vincer's dismissal nonetheless support an inference of an improper motive for the termination.  In doing so, we remain mindful of the caution we expressed in a very different context that today's sophisticated employer is not likely to leave a "'smoking gun' behind" that would provide direct evidence of an illegal animus.[148]

The ALJ determined that Vincer's concerted activity was a motivating factor in his termination, citing the close temporal proximity between that conduct and Vincer's termination, the lack of an investigation into Vincer's production deficiencies, Miller Plastic's purportedly shifting explanations for the termination, and the dearth of disciplinary history for Vincer.

---

[146] *MCPc, Inc.*, 813 F.3d at 488 (quoting *NLRB v. Alan Motor Lines Inc.*, 937 F.2d 887, 889 (3d Cir. 1991)).
[147] *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 815 (3d Cir. 1986).
[148] *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074,1082 (3rd Cir. 1996) (referring to circumstantial evidence of racial bias in the employment context).

As an initial matter, it is clear that Miller Plastic acted with full knowledge of Vincer's protected activity. Zeliesko and Trenary witnessed Vincer's statements at the March 16 meeting, and Zeliesko was a participant in the March 23 conversation. Although Donnie Miller ultimately made the decision to fire Vincer, he did so on the recommendation of Zeliesko and Trenary, and their direct knowledge is sufficient to establish the company's knowledge.[149]

Given Miller Plastic's awareness of Vincer's protected activities, the timing of Vincer's termination provides circumstantial evidence of animus. Vincer was fired a week and a day after he spoke up at the all-hands meeting, *and just one day after his conversation with Zeliesko*. Such a close temporal connection between the protected activities and the termination is highly indicative of a causal connection.[150]

---

[149] *See MCPc, Inc.*, 813 F.3d at 487 n.8 (explaining that employer's knowledge would be established where concerted activity occurred in the presence of management); *Grand Rapids Die Casting Corp. v. NLRB*, 831 F.2d 112, 117 (6th Cir. 1987) (imputing knowledge to employer where, even if final decisionmaker lacked knowledge of employee's union activities, discharge was based on reports from supervisors that did know of union activities).

[150] *See 1621 Route 22 W. Operating Co., LLC v. NLRB*, 825 F.3d 128, 136, 146 (3d Cir. 2016) (upholding finding of unlawful retaliation where employer began disciplining union activists weeks after union election); *Healthcare Emps. Union, Local 399 v. NLRB*, 463 F.3d 909, 920 (3d Cir. 2006)

This is especially so if the temporal connection coincides with a change in how the employer responds to rule violations.[151]  Here, the Board found that while management historically had "counseled" Vincer about issues such as excessive talking, cellphone use, and slow production times, it never formally disciplined him for this behavior.[152]  Then, on March 24, Miller Plastic terminated Vincer, purportedly because he was using his cellphone at work.  In other words, Miller Plastic appears to have switched from tolerating Vincer's cellphone use to terminating him in response to that behavior *one day* after Vincer engaged in protected activity.

We appreciate that a single act of misconduct, when viewed cumulatively with the employee's history, can equate to the proverbial the straw that breaks the camel's back.

---

(finding "an unmistakable inference of anti-union animus" where employer subcontracted out work less than a month after union filed petition for election, and less than two weeks before scheduled election); *D&D Distrib. Co. v. NLRB*, 801 F.2d 636, 639, 641 (3d Cir. 1986) (finding concerted activity was motivating factor when it occurred a week before discharge); *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 872 (6th Cir. 1995) (finding timing supported animus where employer laid off two painters two-and-a-half weeks after they led a meeting on employee grievances).

[151] *See 1621 Route 22 W. Operating Co.*, 825 F.3d at 136–37 (recounting how employer began disciplining employees after union election for rule violations that it historically had tolerated, which supported retaliation finding).

[152] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *2.

Nevertheless, this record is sufficient to infer animus on the part of Miller Plastic. Vincer's personnel file "was relatively bare in comparison" to those of other terminated employees.[153] Vincer's file did not contain any investigation into the reasons for his termination, analysis of his performance deficiencies, documentation of prior rule violations,[154] or even a letter memorializing the termination.[155] By contrast, management prepared a detailed analysis showing that Onuska—who was terminated six days after Vincer—cost the company thousands of dollars by his tardiness and absenteeism. The company did a similar analysis for Shawn Peterson, a machinist discharged in November 2019 for "slow production times and failing to meet company standards."[156] While this level of analysis was not completed for every termination, most other employees had multiple warning-report forms in their files by the time they

---

[153] AR 472.

[154] As we have noted, Miller Plastic did submit into evidence three unsigned warning-report forms, which the ALJ found carried no evidentiary value. That finding is supported by substantial evidence because, as the ALJ explained, the majority of other warning-report forms produced in this proceeding carried signatures, casting doubt on the authenticity of the unsigned forms. In addition, Vincer testified that he had no knowledge of these forms having been placed in his file.

[155] On June 4, 2020, more than two months after Vincer was fired, Miller Plastic provided a bare-bones correspondence that simply stated, "This is an official employment termination letter for Ronald Vincer. He was let go from Miller Plastic[] on March 24, 2020." *Id.* at 388.

[156] *Id.* at 467.

were fired. The exception is Saloom, who, like Vincer, was fired in late-March 2020 for slow productivity but never received a warning.

The ALJ conceded that Miller Plastic's "approach to employee discipline . . . has varied."[157] The record does not reveal any fixed practice of issuing a particular number of warnings or completing an analysis prior to terminating an employee. Nonetheless, the absence of any credited warning reports, analysis, or even a formal termination letter in Vincer's file is consistent with the ALJ's conclusion that Miller Plastic decided to fire Vincer at least partly in response to Vincer's protected conduct.

Miller Plastic frames the evidence quite differently, and as we discuss in the following section, the record also could be interpreted to show that management viewed Vincer's chronic rule violations as unacceptable and cause for termination. However, given our deferential standard for reviewing the ALJ's factual determinations, we agree that a reasonable decisionmaker could conclude that the absence of formal discipline or reprimand meant that Vincer's termination was a significant reversal in Miller Plastic's response to Vincer's rule violations. The company's knowledge of Vincer's protected activity, coupled with a change in its response to Vincer's problematic behavior mere days after the protected activity, and the absence of any investigation, analysis, or documentation in his personnel file to otherwise explain the termination, constitutes substantial circumstantial evidence

---

[157] *Id.*

45

that the protected activity was at least a motivating factor in Vincer's termination.[158]

---

[158] Nevertheless, we note that, contrary to the ALJ's conclusion, there is not substantial evidence that Miller Plastic presented what the ALJ described as "[s]hifting [d]efenses." *Id.* at 472. Miller Plastic's story consistently has been that Vincer was fired for excessive talking and cellphone use that got in the way of his work. The earliest evidence of this is Vincer's unemployment compensation application, completed the day of his termination, in which he reported that he had been fired for "to[o] much talking to coworkers, lack of profits and poor attitude." *Id.* at 429. Vincer later testified that management informed him on March 24 that he was being fired for "poor attitude, talking, and lack of profit." *Id.* at 247:8–9. Later, in a July 2020 form related to Vincer's unemployment claim, Miller Plastic wrote that Vincer was terminated for "not meeting production time for efficiency." *Id.* at 363. While this is not a word-for-word recitation of the language that Vincer used, common sense dictates that talking (at the expense of working) hurts productivity and efficiency. Along these same lines, in an October 2020 letter responding to the Board's investigation, Miller Plastic discussed the reasons for terminating Vincer as "distracting other[s]" and cellphone use, which "goes back to safety standards and distraction of the quality of work" and "cause a lack of efficiency and a slowdown of their output." *Id.* at 404. The ALJ faulted Miller Plastic for "add[ing]" that this conduct posed "safety risks" and that Miller Plastic faced difficult economic circumstances. *Id.* at 472. Yet it seems clear that these are simply additional ways of explaining why Vincer's

46

## 2. *Wright Line* Step 2: Miller Plastic's Burden

At the second step of the *Wright Line* analysis, the burden shifts to the employer to "demonstrate by a preponderance of the evidence that it *would have* taken the same adverse action for legitimate reasons, not merely that it *could have* done so."[159] Miller Plastic maintains that Vincer's poor performance would have led to his termination whether or not he raised concerns about pandemic policies, particularly in light of the financial pressures that Miller Plastic faced by late-March of 2020.

The ALJ agreed that pandemic-era economic pressures would have led Miller Plastic to fire *some* employees in late March.[160] The ALJ characterized the terminations of Cowger, Saloom, and Onuska as "clearly related to the staffing decisions that [Miller Plastic] needed to make prior to entering the PPP program."[161] The ALJ acknowledged that these same

---

talking and cellphone use were unacceptable: Vincer was talking instead of working, which was bad for efficiency, safety, and profitability.

[159] *Starbucks Corp.*, 125 F.4th at 89.

[160] AR 472–73 ("Facing a likely economic downturn, [Miller Plastic] did have some hard decisions to make—keep the business running but downsize in order to apply for the amount of PPP program relief that it believed would accurately reflect its payroll.").

[161] *Id.* at 471.

47

considerations were "a factor" in Vincer's termination.[162] Nonetheless, the ALJ believed that it was unclear whether Vincer would have been among those fired if not for his protected conduct, given the "absence of documentary or other reliable evidence . . . [of] how Vincer's production compared to other employees."[163]

This conclusion assumes that Miller Plastic selected the employees to fire in late March by comparing production times. We do not see evidence of this in the record. If anything, the absence of any productivity or performance-related analyses for Cowger and Saloom undercuts that assumption. Concomitantly, the ALJ's analysis fails to account for the substantial evidence of other reasons that plausibly could have caused Vincer to be among those fired: his excessive talking and cellphone use.[164]

It is undisputed that company policies prohibited cellphone use during working hours and that employees knew of this policy. The Employee Handbook and Company Policies warn of discipline for "interfer[ing] with the orderly and efficient operation of a department"[165] or "[n]eglect of

---

[162] *Id.* at 465; *see also id.* at 472 ("[Miller Plastic's] financial condition was a factor in the decision to discharge four employees, including Vincer, between March 24 and 31.").
[163] *Id.* at 473.
[164] Excessive talking and cellphone use would logically be expected to slow production times, as Miller Plastic argued before the ALJ.
[165] *Id.* at 346.

48

duty,"[166] respectively. The common-sense meaning of those phrases reasonably could comprise talking at the expense of working. It also is undisputed, and the Board's factual findings reflect, that Vincer "would often talk to other employees at their workstations,"[167] leading management to "periodically counsel[] Vincer about performance deficiencies, including excessive talking, distracting coworkers, and using his cell phone."[168]

Beyond this, Boustead—the most credible witness—testified that he and Vincer received multiple "verbal warnings" for talking,[169] which supervisors said "several times" was "excessive" and could lead to suspension or being "written up."[170] Even Vincer admitted to receiving multiple

---

[166] *Id.* at 354.
[167] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *1.
[168] *Id.* at *2.
[169] AR 194:21–23 ("We were—I was warned several times when Mr. Vincer was here about talking, him and I, and those were verbal warnings.").
[170] *Id.* at 195:1–12 ("A. If Mr. Vincer and I were talking or if he was in my work area or vice versa, and a plant supervisor or manager had walked through and seen us talking, they would ask us to please quit talking. Q. Did they ever tell you that something more might happen if you didn't stop talking? A. At first, they said that they didn't like it much, but after time had went on, yes, they did. They said that it was getting excessive. Q. Okay. Did they tell you you could be suspended for talking? A. Yes or be actually written up."); *see also id.* at 222:19–23 ("Q. Now, during those last few

verbal warnings.[171]  Boustead testified that he observed Vincer disrupting other employees' work[172] and he understood from management that this talking negatively impacted job times.[173]  He observed Vincer's distracting behavior become more severe beginning in late 2019.  Boustead testified that he asked to be moved to a workstation further from Vincer, and after he

months of Mr. Vincer's employment with Miller Plastic, did you ever observe him being warned about his behavior?  A. Yes, several times, because I was, as well, because of our talking and him talking to me.").

[171] *Id.* at 262:7–10 ("Q.  [D]id someone warn you not to be talking on March 5th, 2020?  A.  Donnie Miller walked by and said you need to stop talking."); *id.* at 262:20–25 ("A. [Trenary] came in front of my bench and [Boustead's] bench . . . and said, hey, guys, we got to get working, less talk.  Q. So, you had been warned about that type of conduct before, is that fair?  A.  Once or twice, yes."); *id.* at 264:19–24 ("A.  I was moved away from a former employee.  I was moved to the other end of the fabrication line.  Q.  So, at one point in time, you had been caught talking too much to your co-workers, and you were moved to a different location in the plant, correct?  A.  If that's how you want to put it, correct.").

[172] *Id.* at 220:9–12 ("Q.  Was his conduct disrupting you?  A. Yes.  Q.  In your work.  Q.  Yes.  And other employees as well.").

[173] *See id.* at 196:7–16 (recounting a conversation in which management asked Boustead why he and Vincer were talking so much and "why the job times had went down"); *id.* at 199:21–23 ("A. . . . . Being new, I didn't realize [at the beginning] that the talking was causing the problems that it was at work with job times and performance.").

was moved, his productivity improved.[174] Boustead also testified that in the months before Vincer's termination, Vincer was on his cell phone ten or more times in a day, and continued to walk over to Boustead's new workstation to talk.

The ALJ did not seriously address the implications of this testimony insofar as it bears on whether Vincer would have been included in the group fired at the end of March. To be sure, the ALJ discounted other evidence of Vincer's poor performance, such as the written warning reports and the testimony of Trenary and Zeliesko. But the absence of written warnings does not mean that management was unaware of, or unconcerned with, Vincer's rule breaking. Miller Plastic's Employee Handbook makes clear that Vincer was not entitled to a particular number of formal warnings before being fired.[175] Regardless of whether Vincer received warnings or just counseling, his performance was sufficiently problematic that management repeatedly spoke to him about it and colleagues took notice.

---

[174] *Id.* at 196:12–16 ("I had suggested that maybe if they moved me, it might help the situation, which they ended up doing. And after I was moved and Ron and I were sort of not next to each other where he could talk to me all day, my job times increased. And I've had no problems since then."); *id.* at 223:23–24 ("I realized after I was moved that my times had increased.").

[175] *See id.* at 346 (stating that the company "does not guarantee that one form of [disciplinary] action will necessarily precede another").

51

While a factfinder plausibly could disregard Boustead's descriptions of Vincer's performance because Boustead was not a supervisor, the ALJ never said that he was discrediting Boustead's testimony on this or any other basis. Moreover, doing so would have the troublesome consequence of leaving Vincer as the sole witness able to testify about his own performance, to the extent the ALJ discredited Trenary and Zelisko's testimony. To compound this problem, the ALJ appears to have selectively relied upon certain testimony from Trenary and Zeliesko,[176] despite having characterized those witnesses as not credible overall.[177] Without a more precise explanation of which testimony was deemed credible and why, we cannot determine if the ALJ adequately accounted for pertinent testimony regarding Vincer's performance. Potentially relevant testimony from Trenary and Zeliesko includes that: (1) management issued verbal warnings to Vincer "many, many times"[178] about "his distractions and not

---

[176] *See, e.g.*, *id.* at 459 n.8 (relying on Zeliesko and Trenary's testimony "that employee discipline should be based on violations of [Miller Plastic's] policies"); *id.* at 462 n.11 (relying on Zeliesko's testimony to support the conclusion that management communicated with employees about the pandemic); *id.* at 467 nn.23, 24 (relying on Zeliesko's testimony to establish non-pretextual reasons for terminating Cowger and Saloom); *id.* at 470 (recounting Vincer's March 16 assertion that "we shouldn't be working," a direct quote from Trenary's testimony).

[177] *Id.* at 460 n.9 ("Zeliesko . . . was not a credible witness."); *id.* at n.10 ("Trenary also lacked credibility.").

[178] *Id.* at 46:13.

following company policy,"[179] (2) managers had to make sure Vincer was still working "almost every single time" they went through the plant, [180] (3) Vincer "just completely stopped working" when talking to colleagues,[181] (4) Vincer's habit of talking instead of working "was pretty bad"[182] and getting worse over time, and (5) Vincer frequently "walk[ed] 80 feet away from his workstation to . . . talk with Mr. Boustead" after Boustead moved to a new workstation.[183]

If Vincer's performance declined in the months before he was terminated, if management repeatedly spoke to him about this, and if management planned to make certain staff cuts in response to pandemic-era economic conditions, it is reasonable to conclude that Vincer would have been included in the group fired in late-March even if he had never spoken up about pandemic safety. Yet the ALJ rejected Miller Plastic's affirmative defense in just three sentences that did not account for the testimony discussed above. Rather, the ALJ focused solely on "how Vincer's production compared to other employees."[184] The ALJ did not explain whether he was discrediting the testimony about Vincer's performance, nor did he otherwise attempt to reconcile that testimony with the evidence that Miller Plastic needed to make staff cuts in late-

---

[179] *Id.* at 46:9–10.
[180] *Id.* at 51:11; *see also id.* at 141:12 ("It was just constant with [Vincer]."); *id.* at 154:7–8 ("[Vincer] was always texting.").
[181] *Id.* at 142:21–22.
[182] *Id.* at 144:6.
[183] *Id.* at 155:10–11.
[184] *Id.* at 473.

March. The Board, as we have noted, did not independently analyze this issue at all, writing simply that "[f]or the reasons stated by the [ALJ]," it was "reject[ing]" Miller Plastic's affirmative defense.[185]

On a petition for review, where the agency has not fully analyzed an issue, we are "not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach [our] own conclusions based on such an inquiry."[186] Instead, where, as here, a matter is "plac[ed] primarily in agency hands," the proper course "is to remand to the agency for additional . . . explanation."[187] This holds true when an agency addresses an issue to some extent but fails to grapple with important evidence supporting a contrary result.[188] Although there are "'rare circumstances' where remand is not

---

[185] *Miller Plastic Prods., Inc.*, 2023 WL 5669331, at *3 n.9; *see also id.* at *11 ("As stated in footnote 9, above, we adopt the judge's findings that . . . [Miller Plastic] failed to prove that it would have discharged Vincer even absent this [protected] conduct.").

[186] *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (per curiam) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)) (holding court of appeals erred by reversing agency based on evaluation of a factual issue that the agency had never addressed in the first instance).

[187] *Id.* (quoting *Fla. Power*, 470 U.S. at 744).

[188] *See, e.g., MCPc, Inc.*, 813 F.3d at 492–93 (remanding to the agency to reevaluate the company's *Wright Line* defense, in part because "certain aspects of the ALJ's findings raise concerns" as to "whether due consideration has been given to those portions of the record supporting the contrary result").

necessary," such as where "the record evidence overwhelmingly supports—and indeed, compels" a particular conclusion,[189] this is not such a case. It is possible that further analysis could reconcile the evidence discussed above with the ALJ's original conclusion. This evidence is not so powerful as to compel the conclusion that Miller Plastic should prevail on its affirmative defense. But there may well exist sufficient evidence in support of Miller Plastic's position, and we are troubled by the ALJ's rather dismissive analysis of the evidence that contradicts its rejection of Miller Plastic's affirmative defense.

We therefore will remand this case for the Board to address the evidence recounted above and to reassess in the first instance whether Miller Plastic would have discharged Vincer even absent his protected concerted activity. In doing so, we take no position as to how that evidence should be weighed or credited. That is not our job.

### c. Whether Miller Plastic Should Have Had an Opportunity to Present its After-Acquired-Evidence Defense

Where an employer can show that it "would have discharged an employee on lawful grounds based on evidence acquired *after* an unlawful termination," the employer may be able to avoid certain remedies that it otherwise would owe to

---

[189] *Kang v. Att'y Gen.*, 611 F.3d 157, 168 (3d Cir. 2010) (reversing the BIA without remanding for reevaluation of evidence that "compel[led]" a contrary conclusion, where "no amount of reconsideration by the BIA would change that").

the unlawfully terminated employee.[190]   In particular, "reinstatement is not appropriate and backpay is only available from the time of the unlawful termination to when the employer acquired knowledge of the misconduct."[191]   After-acquired evidence is not, however, a defense to liability. Distinct from an employer's affirmative defense under *Wright Line*, the after-acquired-evidence defense bears only on the nature of the appropriate remedy once an employer is found liable for violating the Act.[192]

Because liability is a distinct inquiry from whether, and to what extent, an employee may be entitled to reinstatement and back pay, the Board historically has followed an "established two-stage procedure," first evaluating liability, and later resolving the details of reinstatement and backpay.[193]

---

[190] *Starbucks Corp.*, 125 F.4th at 92–93 (emphasis added).
[191] *Id.* at 93.
[192] *See Mardell v. Harleysville Life Ins. Co.*, 31 F.3d 1221, 1228 (3d Cir. 1994), *judgment vacated*, 514 U.S. 1034 (1995), *reaffirmed in relevant part*, 65 F.3d 1072, 1073 (3d Cir. 1995) (explaining in the analogous context of a Title VII or ADEA suit that after-acquired evidence "is not relevant in establishing liability . . . because the sole question to be answered at that [liability] stage is whether the employer discriminated against the employee on the basis of an impermissible factor at the instant of the adverse employment action").
[193] *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 411 (1960) (Frankfurter, J., concurring) (describing the Board's "established two-stage procedure" of "first . . . hold[ing] a

Federal courts repeatedly have endorsed this approach, explaining that "compliance proceedings provide the appropriate forum . . . to offer concrete evidence as to the amounts of backpay, if any, to which the discharged employees are individually entitled."[194]  We accordingly have held that it is appropriate to defer consideration of an after-acquired-evidence defense to the compliance proceeding "where the standard remedy of reinstatement and backpay has to be tailored to the particular circumstances."[195]

At the hearing before the ALJ, counsel for Miller Plastic attempted to elicit testimony about information uncovered after Vincer's termination that purportedly would have justified terminating Vincer.  Counsel for the Board objected that such evidence was not relevant to Miller Plastic's liability and should be explored only if and when Miller Plastic is ordered to reinstate Vincer.  The ALJ agreed with the Board, explaining that such evidence would "relate[] to the remedial portion" of

---

hearing to determine whether an unfair labor practice was committed," and only later, after judicial review on liability, determining the amount of back-pay due).

[194] *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984); *see also Waterbury Hosp. v. NLRB*, 950 F.2d 849, 856 (2d Cir. 1991) (explaining "it was not inappropriate for the Board to postpone . . . until the compliance stage of the proceedings" a determination of which strikers were entitled to reinstatement); *Rogers Mfg. Co. v. NLRB*, 486 F.2d 644, 649 (6th Cir. 1973) ("We leave to compliance proceedings the question of which striker may not be entitled to reinstatement.").

[195] *1621 Rte. 22 W. Operating Co.*, 825 F.3d at 149 n.14.

the case but that at the liability stage, "after-acquired evidence cannot be applied or considered" in determining whether Vincer was discharged in violation of the Act.[196] On appeal, Miller Plastic argues that the ALJ erred as a matter of law by precluding Miller Plastic from eliciting this testimony.

Our ruling in *1621 Route 22 West Operating Company* plainly endorses the practice of deferring consideration of after-acquired evidence to compliance proceedings.[197] Miller Plastic relies on a sole Board decision, *Tel Data Corporation*,[198] in arguing that it nonetheless should have been permitted to present its defense before the ALJ. In *Tel Data*, the Board took note of after-acquired evidence that was "not relevant" to the issue of liability but "nonetheless must be considered in determining whether [the employee] is entitled to reinstatement and full backpay."[199] The Board proceeded to evaluate that evidence at the liability stage.[200] While that case and others do show after-acquired evidence has sometimes been considered at the liability stage,[201] we are aware of no case suggesting that this is required. To the contrary, the cases

---

[196] AR 116:8–15.

[197] 825 F.3d at 149 n.14 (concluding that it would be "premature" in the liability phase of that case "to evaluate . . . arguments regarding after-discovered evidence").

[198] 315 N.L.R.B. 364, 366–67 (1994), *aff'd in part*, 90 F.3d 1195 (6th Cir. 1996).

[199] *Id.* at 367.

[200] *Id.*

[201] *See also Starbucks Corp.*, 125 F.4th at 92–93 (reviewing after-acquired-evidence defense presented alongside challenge to liability).

discussed above explicitly endorse withholding such consideration until compliance proceedings.

The ALJ indicated that Miller Plastic would have an opportunity to present its after-acquired evidence in a later compliance proceeding, and the Board advocates this approach in its brief. We see no basis to require the agency to follow a different procedure now. We therefore will deny the petition for review on this issue.

## IV. Conclusion

For the foregoing reasons, we will deny in part Miller Plastic's petition for review and grant in part the Board's cross-application for enforcement, insofar as the Board asks us to affirm its finding that Vincer met his prima facie burden to show that he was terminated because of his concerted activity. We will also deny Miller Plastic's petition for review of the ALJ's decision to disallow testimony regarding Miller Plastic's after-acquired-evidence defense. However, we will deny in part the Board's cross-application for enforcement of its Order and grant in part Miller Plastic's petition for review because the NLRB failed to adequately address certain evidence bearing on Miller Plastic's defense to liability under *Wright Line*. Accordingly, we will vacate the Board's Order and remand this case for the Board to address the significance, if any, of that evidence.[202]

---

[202] We need not address Miller Plastic's claim that the Board abused its discretion in overruling its decision in *Alstate*. As we explained above, *Alstate* is not irreconcilable with prior Board precedent as set forth in *Meyers I* and its progeny.